**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MAXWELL KELLER, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>     v.<br><br>TRONOX HOLDINGS PLC, JOHN D. ROMANO, and D. JOHN SRIVISAL,<br><br>               Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Maxwell Keller ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Tronox Holdings PLC ("Tronox" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Tronox's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Tronox common stock between February 12, 2025, to July 30, 2025, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Tronox's overall expected growth and strength in the Company's pigment and zircon commercial division. Defendants' statements included, among other things, confidence in Tronox's ability to achieve its fiscal 2025 revenue growth projections on back of its ability to both appropriately forecast and execute upon the alleged demand for its TiO2 and zircon products.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Tronox's ability to forecast the demand for its pigment and zircon products or otherwise the true state of its commercial division, despite making lofty long-term projections, Tronox's forecasting processes fell short as sales continued to decline and costs increased, ultimately, derailing the Company's revenue projections. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Tronox's securities at artificially inflated prices.

4.      On July 30, 2025 Tronox announced its financial results for the second quarter of fiscal 2025, revealing a significant reduction in TiO2 sales for the quarter. The Company attributed the decline to "softer than anticipated coatings season and heightened competitive dynamics." As a result of the setback in sales, Defendants revised the Company's 2025 financial outlook lowering its full-year revenue guidance and reducing its dividend by 60%.

5.     Investors and analysts reacted immediately to Tronox's revelation. The price of Tronox's common stock declined dramatically. From a closing market price of $5.14 per share on July 30, 2025, Trox's stock price fell to $3.19 per share on July 31, 2025, a decline of about 38% in the span of just a single day.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Tronox is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased Tronox common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Tronox is attached hereto.

12.     Tronox is a United Kingdom corporation with its principal executive offices located at 263 Tresser Boulevard, Suite 1100, Stamford, Connecticut 06901. During the Class Period, the Company's common stock traded on the NYSE Stock Market (the "NYSE") under the symbol "TROX."

13.     Defendant John D. Romano ("Romano") was, at all relevant times, the Chief Executive Officer of Tronox.

14.     Defendant D. John Srivisal ("Srivisal") was, at all relevant times, the Senior Vice President and Chief Financial Officer of Tronox.

15.     Defendants Romano and Srivisal are sometimes referred to herein as the "Individual Defendants." Tronox together with the Individual Defendants are referred to herein as the "Defendants."

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Tronox's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being

4

concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.     Tronox is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Tronox under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

19.     Tronox operates titanium-bearing mineral sand mines and processes them to produce titanium dioxide (TiO2) products. It offers TiO2 pigment; ultrafine specialty TiO2; zircon; high purity pig iron; monazite; feedstock; and titanium tetrachloride products. The company's products are used for the manufacture of paints, coatings, plastics, and paper, as well as various other applications.

### *The Defendants Materially Misled Investors*
### *Concerning Tronox's Full-Year 2025 Guidance*

#### *February 12, 2025*

20.     On February 12, 2025, Defendants issued a press release announcing its full-year 2024 financial results. The press release also provided Tronox's expected full-year guidance for 2025, stating in pertinent part:

> The Company reported fourth quarter revenue of $676 million, a decrease of 1%, driven by unfavorable average selling prices and product mix impact on $TiO_2$ and

zircon and lower revenue from other products, partially offset by higher sales volumes of zircon and $TiO_2$.

Revenue from $TiO_2$ sales was $533 million, an increase of 3% driven by a 4% increase in volumes partially offset by a 1% price decrease in average selling prices and product mix.

The Company reported fourth quarter revenue of $676 million, a decrease of 1%, driven by unfavorable average selling prices and product mix impact on $TiO_2$ and zircon and lower revenue from other products, partially offset by higher sales volumes of zircon and $TiO_2$.

Revenue from $TiO_2$ sales was $533 million, an increase of 3% driven by a 4% increase in volumes partially offset by a 1% price decrease in average selling prices and product mix.

For the full year 2025, the Company is expecting revenue to be $3.0-3.4 billion driven by improving $TiO_2$ and zircon volumes, partially offset by lower sales from other products. Adjusted EBITDA is expected to be $525-625 million, with improved pigment production costs, partially offset by higher mining production costs. The Company expects the second half of 2025 to be stronger than the first half. Capital expenditures are expected to be $375-395 million. Free cash flow is expected to be relatively flat at the midpoint of the range. The Company identified $125-175 million of sustainable, run-rate cost improvements deliverable by the end of 2026. The Company expects the majority of these savings to be weighted more towards 2026.

21.    CEO John D. Romano added, in relevant part:

***Tronox delivered fourth quarter results in line with expectations despite continued macro weakness. Strong $TiO_2$ commercial performance in Asia Pacific and Latin America mitigated continued lagging demand in Europe, while North America performed as expected. Zircon sales exceeded our previous guidance, driven by strong execution from our commercial group. Additionally, despite significant competitive dynamics across all products, pricing came in as anticipated.*** On operations, we realized $75 million of production cost improvements compared to Q4 2023, owing to consistent and reliable performance in the fourth quarter. As a result, Tronox delivered an Adjusted EBITDA of $129 million in the quarter, well within the previously guided range of $120-$135 million, and an Adjusted EBITDA margin of 19.1%.

Reflecting on the full year, I am proud of the work our team did to remain focused on the things we can control and influence. In 2024, we heightened our focus on safety and reduced our total recordable injuries by 23%. We enhanced our focus on operations, resulting in significant production cost improvements in the second half of 2024. We continued to execute on our capital allocation strategy, prioritizing

investments in the business including replacing our mines reaching end of life. Additionally, we strengthened our balance sheet through opportunistic refinancing transactions and returned $80 million to shareholders in the form of dividends.

*As we look ahead to 2025, we remain committed to safety, continuous improvement and disciplined cost management across our entire business as we navigate through economic uncertainties. Part of our strategy includes the launch of a cost improvement program. We identified $125-175 million in sustainable cost savings, achievable on a run-rate basis by the end of 2026.* This program is focused on enhancing cost efficiency and optimizing asset performance across all aspects of our business. We will continue to evaluate every aspect of our business to drive further improvements.

(Emphasis added).

22.    On February 13, 2025, Defendants conducted an earnings call corresponding to their Q4FY24 results. In pertinent part, Defendant Srivisal discussed their margin goals stating:

Income from operations was $48 million in the quarter, and we reported net loss attributable to Tronox of $30 million. We delivered adjusted EBITDA in the quarter of $129 million, well within the guided range of $120 million to $135 million. We achieved adjusted EBITDA margins of 19.1%. CapEx for the quarter was $117 million and free cash flow was a use of $35 million.

*TiO2 revenues increased 3% versus the year ago quarter as sales volumes improved 4%, partially offset by a 1% decline due to price and product mix. Sequentially, TiO2 revenues declined 13%. Fourth quarter TiO2 volumes declined 11% sequentially. This compares to our previous guidance of a 10% to 15% decrease.*
. . .

*Zircon revenues increased 32% over Q4 2023 as sales volumes increased 43% and partially offset by 11% headwind from price and product mix.* Sequentially, zircon revenues increased 1%, driven by a 9% increase in volumes exceeding our guidance of flat to slightly down versus Q3, which is largely attributable to strong commercial execution in Asia Pacific. This was partially offset by 8% headwind from price and product mix.
. . .

*We saw significant cost improvements by achieving our targeted operating rates and benefited from the sales of lower-cost tons in the quarter. Our adjusted EBITDA of $129 million for the quarter represented a 37% improvement year-on-year, driven by lower production costs, partially offset by unfavorable commercial impacts and headwinds from exchange rates.* Year-on-year production costs improved $75 million due to favorable fixed-cost absorption,

lower raw material costs and nonrepeating idle and LCM charges. Sequentially, adjusted EBITDA declined 10%. Unfavorable commercial impacts were partially offset by improved production costs and tailwinds from exchange rates.

(Emphasis added).

      23.    Additionally on the call, Defendant Romano discussed Tronox's continued improvement in pigment and zircon volumes and cost-improvement plan, stating in relevant part:

> ***Based on our current views on the market dynamics and global economic activity, we expect 2025 revenue to be in the range of $3 billion to $3.4 billion and our adjusted EBITDA to be in the range of $525 million to $625 million.***
> . . .
>
> On the commercial side, we're assuming improvement in pigment and zircon volumes, partially offset by headwinds from nonrepeating other product sales in 2024.
>
> With respect to antidumping, we're already seeing an uplift in Europe and Brazil and expect that benefits would materialize in other jurisdictions like India, where this morning, the Indian trade defense industry recommended definitive duties that we expect will go into effect in the second quarter.
>
> On the operations side, we assume benefits from nonrepeating idle facility and LCM charges and improving pigment production costs. This will be partially offset by higher mining and production costs in the range of $50 million to $60 million as we transition out of older mines into newer mines with higher grade ore deposits.
> . . .
>
> ***Through the execution of our newly formed strategy and our cost improvement program, which I will cover on the next 2 slides, we see significant opportunity for earnings growth ahead.***
>
> ***Slide 12 outlines our new business strategy that we previewed at the beginning of this call and it consists of 4 key components: being the best at what we do; growing our future; leveraging what makes us unique; and being the benchmark for sustainability. This framework builds on the strong foundation previously established and enables us to continue executing on what we do best, while capitalizing on new opportunities.***
>
> Part of our strategy, as we referenced on the previous earnings call, includes the launch of a sustainable cost-improvement program.
> . . .

As a result of the work completed over the last several months, we have identified $125 million to $175 million of sustainable run rate cost improvements by the end of 2026. This program is focused on enhancing cost efficiency and optimizing asset performance across all aspects of our business.

Our target actions will include leveraging operational excellence; harnessing technology to drive efficiency and innovation; enhancing supply chain and integrated business planning strategies; and aligning SG&A to maximize the overall impact on our business.

(Emphasis added).

24.     During the question-and-answer portion of the call, Defendants expanded further on their growth prospects for TiO2 and zircon during the following pertinent exchanges:

<Q: Peter Osterland – Truist Securities, Inc. – Associate> Within your 2025 guidance, could you size or give a range for the volume growth you're assuming for TiO2 and zircon?

<A: John D. Romano> *Well, I'll give you a little bit of -- when we think about -- so on a percentage basis, in the first quarter, when we think about where we were in the first quarter of last year, so Q4 to Q1, we saw a pretty sizable increase, and we're seeing that as we move forward into 2025 first quarter in kind of the same kind of range.*

From a pure percentage basis, John, high single digits?

<A: D. John Srivisal> *High single digits, yes. Yes…Obviously, as we look in the higher end of the range, we do see more robust that's driving the spread in our range primarily. It's the volume and price at the higher end.*

<A: John D. Romano> And again, we won't give a lot of color specifically on regional breakdowns. But in the first quarter, we made reference that we were already starting to see some improvement as a result of some of the duties that are already in place in Latin America, specifically Brazil and Europe. So -- and now we're starting to see a little bit of a lift even in the order book in Asia Pacific. North America is still remaining relatively stable. We haven't seen a huge pickup there yet. But as we move throughout the year, we're expecting those numbers to increase.

<Q: Peter Osterland – Truist Securities, Inc. – Associate> What are you assuming in the guidance in terms of TiO2 market share? Do you maintain your share from 2024? Do you expect you may be able to gain share?

<A: John D. Romano> So clearly, we have lost some share to the Chinese over the course of the last several years. And as demand, it hasn't impact on our numbers for this year, but clearly, part of that will be market share recovery from what we've

lost from China. So I'd say the majority of the share gain is going to come in that area.

We've talked about this historically, strategically protecting some market share where we had to be somewhat competitive on price with some of the pretty significant moves China made on pricing with dumping in place in Europe and in Brazil. And as I mentioned earlier, it looks like it's going to be moving into India by the second quarter. We have a bit of a unique advantage because we've got a free trade agreement from the facility that we shipped the majority of our material out of Australia into India. So I would say there will be share gain in that area.

. . .

<Q: Hassan Ijaz Ahmed – Alembic Global Advisors – Partner> So first on the guidance. I was a bit surprised by it. I mean, you guys are guiding to an increment year-on-year of $10 million to $110 million…And as I sort of try to read through your commentary, I mean it seems you guys are predicating your guidance only on volume growth, right? So is pricing playing a role? Are you factoring in any inventory restocking?

<A: John D. Romano> ***Yes. So Hassan, we're not only focusing on volume growth. There is an assumption in the back half of the year that pricing moves as well. But if you're backing into margin based off of the revenue guide versus the EBITDA guide, there's also this cost element that we talked about on the mining side.***

Again, we referenced it at $50 million to $60 million. We gave you a little bit of a preview even on this, again, planned outage. We've got a bottleneck, which I referenced $7 million to $10 million, but there's definitely an assumption. And I would say it's a reasonable assumption on pricing in the second half, but it's not all based on volume.

(Emphasis added).

### *April 30, 2025*

25.    On April 30, 2025, Defendants issued a press release announcing first quarter 2025 financial results, noting the "stronger than normal seasonable demand uplift in TiO2, sequentially" and confirmed its previous guidance for 2025 adding that it expected revenue to be "driven by improving TiO2 and zircon volumes."

26.    Defendant Romano reiterated Tronox's 1Q financial results and expressed confidence in meeting full-year guidance stating, in relevant part:

> *Tronox realized stronger than normal seasonable demand uplift in TiO$_2$, sequentially. Europe led this growth bolstered by the finalization of anti-dumping duties in January, with sales volumes recovering to levels not seen since Q2 2021. North America also realized stronger seasonable trends, while competitive activity in Latin America, the Middle East and Asia continued to exert pressure on sales.*
>
> . . .
>
> *In response to ongoing macroeconomic volatility, Tronox has taken decisive strategic actions to manage the levers within our control*.
>
> . . .
>
> Our team is working diligently to execute on our cost improvement program, which we expect to deliver sustainable, run-rate cost improvements of $125-175 million by the end of 2026. Our capital expenditures are primarily focused on critical maintenance and ensuring the completion of our South Africa mining projects this year to maintain our vertical integration cost advantage. Once complete, we expect to realize a $50-60 million improvement in our mining cost profile from 2025 to 2026. *We anticipate offsetting the Company's first quarter free cash flow use by generating positive free cash flow across the balance of the year. These measures underscore our commitment to operational efficiency and enhanced earnings.*
>
> *As we navigate through the uncertainties of tariffs, inflation, interest rates and the broader macroeconomic environment, Tronox remains focused on what we can control. We are committed to reducing our costs and improving cash flow through strategic actions.* Our continued advocacy for the implementation of anti-dumping tariffs in Brazil, India, and Saudi Arabia is a testament to our proactive approach in combating competitive pressures. *We have ample levers within our control to ensure sufficient liquidity under various economic scenarios. Through these focused initiatives and execution, we are confident in our ability to create sustainable value for our stakeholders.*

(Emphasis added).

27.    On May 1, 2025, Defendants conducted their earnings call for the first quarter of fiscal year 2025.  In large part, Defendant Srivisal reiterated the Company's fiscal 2025 goals, pertinently stating:

*We generated revenue of $738 million, an increase of 9% sequentially, driven primarily by higher TiO2 sales volumes. Loss from operations was $61 million in the quarter*

. . .

*Sequentially, TiO2 revenues increased 10% as a higher than typical seasonal demand uplift drove a 12% increase in volumes, led by European demand, as John referenced earlier. This was partially offset by a 2% decrease in average selling prices, including mix.*

Zircon revenues decreased 22% compared to the prior year, driven by a 15% decrease in sales volume and a 7% decrease due to price, including mix. Sequentially, zircon revenues decreased 8%, driven by a 6% decrease in volumes and a 2% headwind from price, including mix.

Revenue from other products increased 5% compared to the prior year and 25% versus the prior quarter due to higher sales of pig iron and opportunistic sales of ilmenite.

. . .

*Our adjusted EBITDA of $112 million represented a 15% decline year-on-year as favorable production costs and SG&A cost reductions were offset by unfavorable commercial impacts, freight rate increases and exchange rate headwinds. Production costs were favorable by $9 million compared to the prior year, driven by favorable pigment costs and partially offset by higher mining costs.*

Sequentially, adjusted EBITDA declined 13%. Higher production costs and lower average selling prices, including mix, were partially offset by favorable exchange rate movements and higher TiO2 sales.

(Emphasis added).

28.     During the question-and-answer segment of the earnings call, Defendants spoke

further to their expectations for TiO2 volume growth, during the following pertinent exchanges:

<Q: Peter Osterland – Truist Securities, Inc. – Associate> I was just wondering if we could get an update on how your expectations for TiO2 volume growth are shaping up this year. I know there's, a couple of pieces there with underlying end market demand as well as any above-market growth from winning market share. How is your outlook for the growth you would get this year from each of those evolved over the last few months?

<A: John D. Romano> *So from the standpoint of growth, again, we made reference that we're -- as we go through the year, we're going to start to see a lift in the TiO2 demand. And it's largely driven from the duties that are in Europe*

*already on the anti-dumping and the assumptions that we've made with regards to India and Brazil in the second half of the year.*

So what we're expecting in India is that we should have a final results on duties at the third week of May. And in June -- towards the end of June, we should have a decision on Brazil. So the volume that we're seeing as far as growth is largely driven by the duties in the areas where the anti-dumping has taken effect.

*We also saw in the first quarter, as I mentioned in the prepared comments, North America and Europe was up significantly. Again, Europe was driven by largely the duties. But North America's volume has picked up as it had seasonally. So it was a good move in North America. Still seeing some competitive activity in Latin America, Asia Pacific and the Middle East. But as we get into the second half of the year, we are still anticipating to see that growth on the TiO2 demand in the regions that I just referenced.*

<Q: Peter Osterland – Truist Securities, Inc. – Associate> And then just as a follow-up, could you share the average utilization rate that you're currently running at and expect to run at for 2025 across your TiO2 production footprint, excluding the Botlek plant?

<A: John D. Romano> Yes. So historically, I think what we've been indicating is our operating rates were north of 80%. And with the closure of the Botlek plant, we would expect to continue to run at or above those rates. As the market continues to pick up, we'll continue running rates higher than that. And obviously, we've spent some time preparing for the Botlek outage, knowing that, that plant was going to close, we've repositioned inventories to be sure that we can fill the needs of the European market from other plants.
. . .

<Q: Aziza Gazieva – Fermium Research – VP of Equity Research> Can you guys just elaborate further on what you're seeing in the zircon markets and what might revive that market?

<A: John D. Romano> *So year-over-year last year, first quarter of 2024, we saw a significant increase in the volume on zircon, not dissimilar to the larger increase we saw last year on TiO2 on the assumption that the market was starting to recover. So we saw a lot of volume being bought forward, I would say, in the first quarter. So we had a very strong first half on zircon and the second half of the year was weaker.*

*When we look at what we're seeing this year, it's more of a, I'd say, measured growth with regards to what we're seeing year-over-year. So we're not expecting a significant growth '24 over '25. It's only about 5%. But what we're seeing in the first quarter is more historically what we would see.*
. . .

<Q: Aaron Rosenthal– JP Morgan Chase & Co. – Analyst> I think just earlier, you had mentioned the uplift quarter-over-quarter in Europe was about 2x what you had seen historically from 4Q to 1Q. Is that comment based on a look back from maybe just the last couple of years or is that maybe a 10-year average look back with respect to seasonality?

And then as we think about 2Q, is the magnitude of that uplift into 2Q on par with that? Or how should we think about the growth sequentially?

<A: John D. Romano> *And we're seeing more of a -- I'd say, a bit more of a normal increase, but still heavier in the second quarter in Europe as well. So again, it's not as if -- I think we've started to see growth in the volume as we pick up some of that share, but we have -- we still have room to go. So the second quarter, although the growth is significant, it's not as big of a leap as it was from Q4 to Q1. But we're still seeing growth quarter-over-quarter Q1 to Q2.*

(Emphasis added).

29.     The above statements in Paragraphs 20 to 28 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Tronox's optimistic margin growth goals and demand reassurances for the Company's TiO2 and zircon sales fell short of reality; the Company was ill-equipped to adequately forecast demand for its pigment and zircon products or otherwise minimize the impact of potential demand fluctuations and continued to promote its lofty margin projections which relied upon continually increased sales volumes in its pigment and zircon division.

### *The Truth Emerges during Tronox's Second Quarter Financial 2025 Earnings Report*

#### *July 30, 2025*

30.     On July 30, 2025, Defendants issued a press release unveiling the Company's second quarter 2025 financial results that were below expectations, due to setbacks in TiO2

revenue. The press release also announced the Company was revising its full-year 2025 revenue

guidance, highlighting in relevant part:

> **The Company recorded second quarter revenue of $731 million, a decrease of 11% primarily driven by lower TiO$_2$ and zircon sales volumes and lower average selling prices of zircon.**
>
> **Revenue from TiO$_2$ sales was $587 million, a decline of 10% driven by an 11% decline in volumes slightly offset by a 1% favorable impact due to exchange rates, while average selling prices including mix was flat. Sequentially, TiO$_2$ sales increased 1%, driven by a 1% increase in average selling prices including mix and a favorable 2% exchange rate impact, partially offset by a 2% decrease in sales volumes.**
>
> **Zircon revenue decreased 20% to $68 million, driven by a 10% decline in sales volumes and a 10% decrease in average selling prices including mix.** Sequentially, zircon revenue decreased 1%, driven by a 2% decrease in average selling prices including mix partially offst by a 1% increase in sales volumes.
>
> Revenue from other products was $76 million, a decline of 7% year-over-year primarily due to lower sales volumes of pig iron. Sequentially, revenue from other products decreased 11%.
>
> . . .
>
> **Tronox is adjusting its previous guidance for 2025. Based on current market conditions, the Company is expecting FY 2025 revenue to be $3.0-$3.1 billion and Adjusted EBITDA to be $410-$460 million.** These ranges assume lower pigment and zircon volumes and price than previously anticipated, offset by revenue growth from strategic sales of other products and improved production costs in the second half of the year compared to the first half. The Company expects free cash flow to be a use of $100-$170 million as a result of the lower pigment and zircon sales. The Company further reduced capital expenditures to now be less than $330 million for the year.

(Emphasis added).

31.    In the same press release, Defendant Romano provided the following details for

narrowing the Company's revenue guidance and announcing a 60% dividend cut stating, in

pertinent part:

> **Tronox's second quarter results were impacted by weaker demand across most of our end markets. This resulted in a softer than anticipated coatings season and**

*heightened competitive dynamics. TiO$_2$ volumes in the second quarter were lower by 2% sequentially and 11% year-over-year, reflecting weaker than usual seasonality across all regions.* Broader macroeconomic pressures, including elevated interest rates and tariff-related uncertainties, continued to weigh on consumer discretionary spending, while home sales and construction activity remained subdued. Additionally, delays in Brazil's anti-dumping investigation impacted our sales in the region, though we are encouraged by early momentum in India following the implementation of duties in May. Operational costs remained in-line with expectations and our mining projects continue to progress on schedule.

In response to the prolonged weakness in the market, we are executing on our disciplined strategy to manage through the downturn and optimize earnings and cash. Our cost improvement program is progressing ahead of plan and proving essential in mitigating increasing raw material and operational cost pressures. We remain confident in our ability to deliver $125–$175 million in sustainable, run-rate savings by the end of 2026. We are also selectively adjusting operating rates to preserve cash and deploying targeted commercial initiatives to ensure we maintain and grow our market share in key markets.

*Additionally, we revised our 2025 financial outlook and are taking proactive steps, including adjusting our capital allocation priorities to maximize long-term shareholder value creation. We further reduced capital expenditures this year while ensuring we are not compromising critical investments that support safe and reliable operations.* Our Board of Directors declared a dividend of $0.05 per share for the third quarter, a reduction of 60% that will provide enhanced balance sheet flexibility. We will reevaluate as the market recovers to ensure we target a competitive dividend yield.

(Emphasis added).

32.     On July 31, 2025 Defendants held a corresponding earnings call where Defendant Romano discussed the Company's disappointing second quarter 2025 results stating, in relevant part:

*Our second quarter was impacted by weaker demand across most of our end markets, and this resulted in softer-than-anticipated coating seasons and highlighted competitive -- heightened competitive dynamics across our key end markets. Volumes in Q2 were 2% lower sequentially and 11% lower year-over-year, reflecting weaker-than-usual seasonality.* Broader macroeconomic pressures included elevated interest rates and tariff-related uncertainties continue to weigh on customer discretionary spending, while home sales and construction activity remains subdued.
. . .

16

In response to the prolonged weakness in the market, we are executing a disciplined strategy to manage the downturn and optimize earnings and cash. Operationally, our costs were in line with expectations. The cost improvement program is progressing ahead of plan and is proving essential in mitigating both raw material and operational pressures. We remain confident in our ability to deliver $125 million to $175 million in sustainable run rate savings by the end of 2026. The idling of our Botlek facility was not a decision we took lightly, but it was the right decision and our costs have improved as a result.

Beyond these measures, we are continuing to evaluate all available levers to strengthen our operational foundation, bolster liquidity and reinforce our role as a strategic global supplier to our customers. This includes intensifying our focus on our commercial strategy, further reducing capital expenditures and adjusting the dividend to ensure sustained financial strength and long-term shareholder value.

(Emphasis added).

33.    Defendant Srivisal provided details of the Company's sharp revenue decline for the second quarter 2025 stating, in pertinent part:

> ***We generated revenue of $731 million, a decrease of 11% versus the prior year second quarter, driven by lower sales volumes and unfavorable zircon pricing. Loss from operations was $35 million in the quarter, and we reported a net loss of $84 million, including $39 million of restructuring and other charges that were primarily related to the idling of Botlek.*** While our loss before tax was $81 million, our tax expense was $4 million in the quarter as we do not realize the tax benefits in jurisdictions where we are incurring losses. Adjusted diluted earnings per share was a loss of $0.28. Adjusted EBITDA in the quarter was $93 million, and our adjusted EBITDA margin was 12.7%. Free cash flow was a use of $55 million, including $83 million of capital expenditures.
> . . .
>
> ***Our adjusted EBITDA of $93 million represents a 42% decline year-on-year, driven by higher production costs, unfavorable commercial impacts and higher freight costs. This was partially offset by exchange rate tailwinds and SG&A savings.*** Production costs were unfavorable by $28 million compared to the prior year. This was due to increased direct material costs, higher mining costs and headwinds on pigment production costs, primarily driven by the high-cost tons produced in Botlek in the first quarter as we had expected.
>
> ***Sequentially, adjusted EBITDA declined 17%. Higher production costs, lower TiO2 sales volumes and higher freight costs were partially offset by favorable average selling prices, including mixes, favorable exchange rate movements and SG&A savings.*** Compared to Q1, production costs were a $20 million headwind, driven by higher cost tons produced in Q1 and sold in Q2 as expected and

communicated on our last earnings call. Additionally, we received nonrepeating insurance proceeds in Q1 related to the 2023 Botlek supplier outage.

(Emphasis added).

34.    A question-and-answer portion followed where Defendants discussed the sequential decline in TiO2 volumes and lowering the Company's dividend by 60% stating, in pertinent part:

<Q: Peter Osterland – Truist Securities, Inc. – Associate> Just wanted to start with the 2% sequential decline for TiO2 volumes that you saw in the quarter. Could you break out what you believe the growth rate was for underlying demand quarter-over-quarter? And how much of the decline you realized was driven by market share?

<A: John D. Romano> ***So North America is normally where we have, I'd say, it's Northern Hemisphere is where the big coating season comes in. And in North America, we did see some uptick in volume, but it was not in line with the normal coating season. So again, I think a lot of that had to do with -- I don't believe we had market share loss in North America. That was just largely driven by a muted coating season because we were up slightly in North America, 2% to 3%.***

In Europe, Middle East and Africa, there was some volume decline. Part of that was the market actually wasn't as robust as it was in the first quarter. So it kind of slowed down. And I think there is some element of that macroeconomic environment along with some of the tariff issues that probably weighed on some people's decision to pull down inventory. ***There was an element of competitive activity there. As I mentioned, we raised prices in the second quarter, and there were some competitors that pulled back for volume in that region. So Europe, Middle East and Africa was down a bit.***

Asia Pacific was actually up, up pretty much in line with what we expected, and that was largely driven in India because there were other areas where we saw some volume decline, but India was a big push in Asia Pacific. Latin America was flat, but it was down a bit from what we expected, and that had a lot to do with some of the delays in the final duties going into place where we thought they were going to come in earlier in the third quarter. It looks like they're going to come in towards the back end of the third quarter now.

. . .

<Q: Jeffrey John Zekauskas – JP Morgan Chase & Co. – Senior Analyst> I think your EBITDA guide is $410 million to $460 million for this year, and you did $205 million in the first half and $93 million in the second quarter. So in order to reach

the bottom of your guide, you've got to do $102 million or $103 million on average for the next 2 quarters. To reach the top of your guide, you need to do $127.5 million.

<A: John D. Romano> *So when we think about Q2 to Q3, you should think flat, up or down a little bit. It's not going to be a huge lift. And the big -- the fourth quarter impact, and we mentioned this other opportunity that we're working on. Historically, we have -- in the past, we've had these other product sales, and that is likely to come in the fourth quarter, and that is the piece that will have a swing in that number in the fourth quarter.*
. . .

<Q: Roger Neil Spitz – Bank of America Securities – Analyst> how would you compare your volumes down 11% year-over-year and flat pricing? And Chemours on their pre-release said that their TiO2 sales were up high single digits.

<A: John D. Romano> *So look, if you look over time, there's a lot of fluctuations in market share. And I would just say that the guide that we had for the second quarter initially was to be up mid- to high single digits, and we were down. And I'll go back to the comments that I made before in North America, that was largely driven by a muted coating season. Our volumes were up, but they weren't up as what normally what they would have been.* In Europe, our volumes were -- Europe, Middle East and Africa, they were down, and part of that had to do with the market actually just not being as robust as we thought it was. We weren't planning it for it to be stronger, but it was actually weaker than we expected it to be. And there was competitive activity over there, where, as I mentioned, we were raising prices and we had some competitors that were losing prices, and we picked -- we lost a little volume there.

Asia Pacific, our volumes were up largely tied to what we were going to see in India, as I mentioned before, with some growth in that area. And Latin America, although flat, we were projecting that to be up, and there was some market share shift in that area as well. So when I mentioned our strategy from a commercial perspective, moving into the balance of the year, it's to maintain and/or grow share targeted regions. And the targeted regions for growth are largely in India, and our objective is to maintain our share at normalized rates throughout the year. So I can't speak too much to Chemours on what they announced back in June. And -- but generically, I know what's happening in the market with competition. And in the regions that I mentioned, there's -- the competition is elevated.
. . .

<Q: Hassan Ijaz Ahmed – Alembic Global Advisors – Partner> John, first of all, just wanted to sort of understand a little more about how you guys thought about the dividend cut. Look, I mean, at the end of the day, I understand this downturn has been far more sort of drawn out than prior downturns. But I mean, the industry is cyclical and will continue to remain cyclical. So I'm just trying to understand the logic, in a cyclical industry of having a fixed dividend. I mean, did you guys think

about maybe incorporating some variability into that dividend, maybe having possibly a fixed payout ratio? I mean, just the thought process around the magnitude of the cut as well as the logic behind having a fixed dividend.

<A: John D. Romano> ***So obviously, we did spend a lot of time thinking about that reduction in the dividend, and it was aligned to the current macro environment. And as I said in prepared comments, as the macro changes, we'll continue to evaluate that to make sure it's a competitive dividend.*** We still feel that the dividend is important. It's part of our capital allocation strategy. But in this environment, we felt it was rightsized so that we can manage our liquidity through this longer downturn than we expected.

<A: D. John Srivisal> ***Obviously, we looked at a lot of different analyses, had a lot of different discussions around it and obviously did cut in several other areas. So all that went into our calculus of cutting the dividend by 60%.*** We really want to just maintain our financial flexibility in this market. And as we mentioned earlier, we will relook at the dividend at the appropriate time period.

(Emphasis added).

35.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 13, 2025 and May 1, 2025 earnings calls. On those calls, Defendants continually praised TiO2's strong commercial performance as a key component for Tronox's ability to grow its margins to achieve the EBITDA margin forecasted for the end of fiscal 2025, while simultaneously minimizing risks associated with visibility, seasonality, the potential impact of the macro environment, and possible demand fluctuations for its pigment products.

36.    Investors and analysts reacted immediately to Tronox's revelation. The price of Tronox's common stock declined dramatically. From a closing market price of $5.14 per share on July 30, 2025, Tronox's stock price fell to $3.19 per share on July 31, 2025, a decline of about 38% in the span of just a single day.

37.    A number of well-known analysts who had been following Tronox lowered their price targets in response to Tronox's disclosures. For example, UBS while downgrading to a

neutral rating summarized that "1) volumes/earnings remain more challenged near term, 2) we see a recovery further out than we previously expected, and 3) FCF/leverage remains more challenging in a weaker demand environment. We reduce our EBITDA/FCF outlook and now see minimal FCF over the next two years, and leverage in the ~5-7x range. TROX FCF yield does not become attractive until 2027, and therefore we downgrade to Neutral and wait for more visibility."

38.     Similarly, Truist Securities slashed their price target noting that "going forward, TROX indicated that it expects 2H TiO2 volumes to be improved over 1H driven by strength in the Indian market and an overall heightened focus on maintaining and growing market share, although we do expect this will come at the expense of seq'l lower average realized prices v 1H."

### *Loss Causation and Economic Loss*

39.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Tronox's common stock and operated as a fraud or deceit on Class Period purchasers of Tronox's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Tronox's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Tronox's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

40.     Tronox's stock price fell in response to the corrective event on July 30, 2025, as alleged *supra*. On July 30, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Tronox's forecasting processes and growth guidance.

41.    In particular, on July 30, 2025, Tronox announced a reduction in pigment and zircon volumes compared to the prior quarter, prior year, and overall market expectations. Defendants further signaled a reduction in its full-year 2025 revenue guidance compared its previous outlook for 2025 and reduced its dividend by 60%.

### *Presumption of Reliance; Fraud-On-The-Market*

42.    At all relevant times, the market for Tronox's common stock was an efficient market for the following reasons, among others:

(a)    Tronox's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Tronox communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Tronox was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Tronox was reflected in and incorporated into the Company's stock price during the Class Period.

43.    As a result of the foregoing, the market for Tronox's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Tronox's stock price. Under these circumstances, all purchasers of

Tronox's common stock during the Class Period suffered similar injury through their purchase of Tronox's common stock at artificially inflated prices, and a presumption of reliance applies.

44.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### ***No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine***

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with growth projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

46.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

47.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the

"forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Tronox who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Tronox's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Tronox's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tronox or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions. As of July 21, 2025, there were 158 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

50.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

52.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tronox;

(c)    whether the Individual Defendants caused Tronox to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Tronox's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

53.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against All Defendants for Violations of
### Section 10(b) and Rule 10b-5 Promulgated Thereunder

54.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tronox common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Tronox's

securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

57.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tronox's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

58.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

59.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Tronox's internal affairs.

60.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Tronox's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Tronox's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Tronox's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

61.     During the Class Period, Tronox's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Tronox's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Tronox's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Tronox's common stock

declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

62.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

64.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Tronox's misstatements.

66.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Tronox which had become materially false or misleading.

67.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Tronox disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Tronox to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tronox's common stock.

68.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Tronox to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

69.    By reason of the above conduct, the Individual Defendants and/or Tronox are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.


Dated: September 3, 2025                          Respectfully submitted,

                                                  **LEVI & KORSINSKY, LLP**

                                                  /s/ Shannon L. Hopkins
                                                  Shannon L. Hopkins (CT29744)
                                                  1111 Summer Street, Suite 403
                                                  Stamford, Connecticut 06905
                                                  Tel. (203) 992-4523
                                                  Fax: (212) 363-7500
                                                  E-mail: shopkins@zlk.com

                                                           -and-

                                                  Adam M. Apton
                                                  LEVI & KORSINSKY, LLP
                                                  33 Whitehall Street, 27th Floor
                                                  New York, New York 10004
                                                  Tel.: (212) 363-7500
                                                  Fax: (212) 363-7171
                                                  Email: aapton@zlk.com

                                                  *Attorneys for Plaintiff*