**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

<table>
<tr>
<td>

MAXWELL KELLER, Individually and
On Behalf of All Others Similarly Situated,

        Plaintiff,

        v.

TRONOX HOLDINGS PLC, JOHN D.
ROMANO, and D. JOHN SRIVISAL,

        Defendants.

</td>
<td>

CASE No.: 3:25-cv-01441-KAD

**MEMORANDUM OF LAW OF JOHN HARDING IN OPPOSITION TO COMPETING LEAD PLAINTIFF MOTIONS**

<u>CLASS ACTION</u>

</td>
</tr>
</table>

Lead Plaintiff Movant John Harding ("Mr. Harding") respectfully submits this opposition to the pending competing lead plaintiff motions filed by Travis Grube ("Grube") and Dean Gautier ("Gautier," and as a group, the "Tronox Investor Group" or the "Group"), and Jason D. Smith ("Smith"). Dkt. Nos. 11 and 14.

## BACKGROUND

Three lead plaintiff motions were filed in this Court seeking appointment as lead plaintiff and approval of lead counsel, for the class of all purchasers and acquirers of Tronox Holdings plc ("Tronox") common stock between February 12, 2025 and July 30, 2025, inclusive (the "Class Period")

While Smith and the Tronox Investor Group each claim to have suffered larger losses than Mr. Harding, neither qualify as presumptive lead plaintiff because they cannot meet the adequacy and typicality requirements of Rule 23 of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

1

Smith is atypical and inadequate because, as a day trader, he is subject to a unique defense. Moreover, Smith impermissibly claims losses that occurred *before* the lone July 30, 2025 corrective disclosure, which are not recoverable. As the Supreme Court has previously held, losses sustained prior to a corrective disclosure are not recoverable because they could have been due to a variety of factors that are wholly unrelated to the alleged fraud.

The Group is atypical and inadequate as it is an improper lawyer-made group of unrelated investors. Further, Grube is independently inadequate and atypical because he appears to credit losses from options transactions from *outside the class period*. The other member, Gautier, appears to have a criminal history which, if that is the case, calls into question his ability to act as a fiduciary. There is no indication that Grube was aware of this history when he agreed to be in the Group with Gautier, or conversely, that Gautier was aware of potential issues with Grube's loss calculation. Even if Gautier and Grube are independently adequate (in contrast to the improper Group), the Court should refuse to consider either on an individual basis because they did not request to be considered individually, should the Group's efforts fail.

In contrast, Mr. Harding, has the greatest remaining loss and, unlike Smith or the Group, satisfies Rule 23's adequacy and typicality requirements. As such, the PSLRA provides that he is presumed to be the "most adequate plaintiff" and, therefore, should be appointed lead plaintiff on behalf of the putative class. *See* 15 U.S.C. § 78u4(a)(3)(B)(iii)(I).

## ARGUMENT

### I.    APPLICABLE STANDARD

Under the PSLRA's analysis, Mr. Harding should be appointed the Lead Plaintiff as "[i]n appointing a lead plaintiff, the court's first duty is to identify the movant that is presumptively entitled to that status." *In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001). "If [the movant alleging the greatest financial interest] does not satisfy the criteria of Rule 23, the Court

must repeat the Rule 23 inquiry, this time considering the plaintiff with the next-largest financial stake. The Court so proceeds until it finds a plaintiff who is willing to serve and is able to satisfy the requirements of Rule 23." *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 396 n.7 (S.D.N.Y. 2008) (citing *In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002)).

Mr. Harding has a substantial financial interest and is the only movant who has demonstrated adequacy and typicality and thus, is the presumptive lead plaintiff. Moreover, as set forth in his opening papers, Mr. Harding has made a *prima facie* showing of his adequacy and typicality. He submitted a certification attesting to his willingness to serve as lead plaintiff. Dkt. No. 10-4. His claims are also typical of other class members because his claims arise from the same legal theories and same nucleus of fact. Dkt. No. 10-1, at 5. His interests are aligned with the interests of the other class members as he has the same incentives to prove the defendants' misconduct. *See id*. He lives in Michigan and is an experienced investor. *Id.* at 6. He has a bachelor's degree from the University of Michigan and owned a travel agency. *Id*. There are no conflicts of interest between Mr. Harding and absent class members.

In short, based on his financial interest in the litigation and satisfaction of the Rule 23 requirements at this stage, Mr. Harding has triggered the PSLRA's most adequate plaintiff presumption. 15 U.S.C. § 78u4(a)(3)(B)(iii)(I).

## II.    THE COMPETING MOVANTS ARE INADEQUATE

### a. Smith is an inadequate and atypical day trader who impermissibly inflates his loss.

According to Smith's loss chart, he made fifteen separate buy orders on April 3, 2025, and then fifteen separate sell orders on the same day. *See* Dkt. No. 11-4. On July 30, 2025 he similarly bought and sold Tronox shares. *Id*. Clearly, he is a day trader. This subjects him to a unique defense because it undermines the presumption that he relied on defendants' allegedly

false statements. It thus renders him inadequate and atypical.

As the court explained in *Galmi v. Teva Pharmaceuticals Industries Ltd.*, 302 F. Supp.3d 485, 504 fn. 10 (D. Conn. 2017), "given [movant's] status as a potential 'day trader,' he may be subject to unique defenses that make him an inappropriate lead plaintiff." Further, "[t]he merits of whether the day trading defense is actually the prevailing law within the Circuit, however, is not necessarily relevant. Rather, the question is whether the appointment of a particular lead plaintiff would lead to the defendant raising unique defenses against that lead plaintiff that would unnecessarily complicate and/or stall the litigation." *Id*. Further, "[e]vidence that a particular plaintiff may be subject to the unique defense that it did not actually rely on the company's alleged misstatements is sufficient for a court to decline to appoint that plaintiff[.]" *Id.* (internal citations omitted) *See also In re Opnext, Inc. Sec. Litig.*, 2008 WL 3285732, at *3 (D.N.J. Aug. 7, 2008) (finding movant atypical because "[d]ay trading is not commensurate with the manner in which the typical class member sustained alleged losses. Such in-and-out trading is susceptible to unique defenses that are not equally applicable to other class members").

In addition, Smith purchased the shares on both April 3 (among other times) at a higher price than the price at which he claims to have sold the shares on that day, and otherwise sold shares prior to the disclosure at a lower price than other shares he bought. *See* Dkt. No. 11-4. As a result, he is claiming losses on trades that occurred *prior* to the single disclosure at issue, which caused a stock decline on July 31, 2025. *See* Dkt. No. 10-1, at 2. This is impermissible because he cannot attribute those losses to defendants' alleged misconduct.

The Supreme Court explained in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) that "in [fraud-on-the-market cases,] an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." Further, "[if the purchaser] *sells* the

shares quickly ***before the relevant truth begins to leak out***, ***the misrepresentation will not have led to any loss***." *Id.* (Emphasis added). Further, "when the [purchaser] resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id*. at 342-343. *See also In re Comverse Technology, Inc. Sec. Litig.,* 2007 WL 680779 at *4-5 (E.D.N.Y. Mar. 2, 2007) ("[I]t is clear that under *Dura*[,] any losses that [movant] may have incurred before Comverse's misconduct was ever [disclosed] are not recoverable, because those losses cannot be proximately linked to the misconduct at issue in this litigation.") (vacating decision appointing movant claiming loss based on pre-disclosure losses).

Smith's loss chart only claims a LIFO loss total. It does not contain a loss figure that accounts for the Supreme Court's decision in *Dura*, which it should in light of his repeated pre-disclosure sales. Dkt. No. 14-3. He should provide an amended loss chart that reflects losses that are *actually recoverable*, and which is consistent with his other papers. His loss chart contains discrepancies (as compared to his PSLRA certification) in terms of how transactions are listed (including different numbers of transactions listed for April 3, 2025). *Compare* Dkt. No. 11-4 *with* Dkt. No. 11-3. Confusingly, his loss chart includes trades that are not listed chronologically. Dkt. No. 11-4. It should not be the responsibility of other movants to attempt to decipher what Smith's recoverable losses are when he has not made a meaningful effort to demonstrate as much.

In *Rodriguez v. DraftKings Inc.*, 2001 WL 5282006 at *6 (S.D.N.Y. Nov. 12, 2021), the court noted that "[t]***he slovenliness of [movant's] submissions is undoubtedly relevant and concerning, and plays an important role in the Court's assessment of his adequacy as a***

*putative class representative*.” Further, the court noted that although the movant at issue had sought to minimize issues with his submissions, the court was “not buying” his excuses because “[h]ad [movant] been serious about his responsibilities as a budding class representative, ***he should not have had to have been alerted to these basic errors in the first place***.” *Id*. at *9. Even if that movant had not had issues with his submissions, as the court noted, he was subject to a unique defense because, like Smith, he was a day trader, and rejected his motion. *See id*. at *10-11. In sum, Smith’s motion should be rejected even if he provides an amended loss chart.

### b. The Tronox Investor Group is an Improper Group and is Otherwise Inadequate and Atypical.

The Tronox Investor Group, which claims a $1,199 loss (which, as outlined below, is questionable) is an improper lawyer-made group of unrelated investors.  The “group” consists of two unrelated movants – Travis Grube, who claims $976 in losses, and Dean Gautier, who claims $223 in losses. Dkt. No. 12-3. The duo has no pre-litigation relationship. It is unclear whether they have ever communicated with each other outside of a call orchestrated by counsel. (Dkt. No. 12-6). The Group members signed their joint declaration on November 3, 2025, the day of the lead plaintiff deadline, demonstrating the last-minute nature of the Group’s creation. Dkt. No. 12-6. As this court explained in *Galmi*, 302 F. Supp.3d at 494, when members of a group “have not adequately explained how they came to meet each other[,] one must assume that the group was arranged—or at least introduced—at the direction of counsel.”

While some courts have permit unrelated investors to aggregate their losses, the majority of Courts in this Circuit reject unrelated groups of investors. *See id.* at 493 (“When group members have limited or no prior relationship, however, courts look skeptically at whether the grouping operates to circumvent the purposes of the PSLRA”); *See also Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 532-533 (S.D.N.Y. 2015) (rejecting lead plaintiff group that

6

was "plainly a creation of counsel"); *Takata v. Riot Blockchain, Inc.*, 2018 WL 5801379, at *5 (D.N.J. Nov. 6, 2018) (refusing to aggregate losses of lead plaintiff groups because each group failed to satisfy the adequacy requirement); *Int'l Union of Operating Engineers Loc. No. 478 Pension Fund v. FXCM Inc.*, 2015 WL 7018024, at *3 (S.D.N.Y. Nov. 12, 2015) (rejecting lead plaintiff group because "it has the highest financial losses only if it is allowed to aggregate the losses of its two unrelated members.").

Most disfavored are groups that are clearly a product of their attorney's machinations, rather than an organic grouping. *See Galmi* at 302 F.Supp. 3d at 495 ("Even if a group is able to show that it is able to function cohesively and effectively manage the litigation, courts will not permit aggregation of their financial interests if it is apparent that the group 'has been assembled as a makeshift by attorneys for the purpose of [obtaining lead plaintiff status.") (alteration in original and internal citations omitted); *See also Int'l Union,* 2015 WL 7018024, at *2–3 (rejecting group that failed to provide evidence that their grouping was not the product of lawyer-driven litigation); *Elstein v. Net1 UEPS Techs., Inc.*, 2014 WL 3687277, at *5 (S.D.N.Y. July 23, 2014) (rejecting group because it was "cobbled together" for the purpose of achieving lead plaintiff designation); *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 308 (S.D.N.Y. 2001) (same).

Courts require members of a group to make "an evidentiary showing that unrelated members of a group will be able to function cohesively and to effectively manage the litigation apart from their lawyers before its members will be designated as presumptive lead plaintiffs." *Kniffin v. Micron Tech., Inc.*, 379 F. Supp. 3d 259, 262 (S.D.N.Y. 2019) (internal citation omitted). To determine whether such a showing has been made, courts evaluate evidence regarding:

(1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa.

*See id*.; *See also Galmi*, 302 F. Supp.3d at 494; *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 392 (S.D.N.Y. 2008).

While the Group submitted a joint declaration (Dkt. No. 12-6) (the "Declaration") to try and meet this burden, the boilerplate Declaration is insufficient. The Group asserts that its members spoke with each other prior to the lead plaintiff motion being filed, but the Declaration indicates they did so through their counsel. And so, it appears the Group's counsel arranged their combination for the purposes of this litigation. *See* Dkt. No. 12-6, ¶ 4. Courts have routinely rejected similar joint declarations. *See Galmi,* 302 F.Supp.3d at 495 ("Conclusory statements such as 'each group member shares a common purpose or goal in obtaining a [recovery]' are not evidence of a group's cohesiveness"); *Jakobsen v. Aphria, Inc*., 2019 WL 1522598, at *3 (S.D.N.Y. Mar. 27, 2019) (vague plans for cooperation and "boilerplate assurances" are insufficient to show that unrelated investors will be able to manage the litigation efficiently); *Kniffin*, 379 F. Supp. 3d at 263 (court not persuaded by declaration that the group would function cohesively) (noting that "[v]ague discussions of general communications protocols and status reports hashed out over preliminary conference calls do little to show the groups' involvement in the litigation"); *Takata*, 2018 WL 5801379 at *5 (denying lead plaintiff status to a group of investors because the "joint declaration [did] not allay [the court's] concerns about appointing a loose, attorney-driven group of investors as lead plaintiff.").

The Group's supposed dispute resolution mechanism further illustrates the Group's incompatibility with the PSLRA. The Declaration states that "we agree to resolve [a] disagreement by a majority vote, in which each of us possesses a number of votes equal to our

losses incurred in connection with our Class Period purchases and acquisitions of Tronox common stock [. . .]" (Dkt. No. 12-6) This means Grube, who claims a greater loss than Gautier, would be able to out-vote him on every issue. This is disqualifying because it gives complete control to Grube on all disputes—eviscerating the idea that this is a group in anything but name. Courts often view inequitable dispute resolution arrangements as evidence that a group is improper under the PSLRA. *See, e.g., In re LightInTheBox Holding Co., Ltd. Sec. Litig.*, 2013 WL 6145114, at *2 (S.D.N.Y. Nov. 21, 2013) (rejecting a lead plaintiff movant group on account of its dispute resolution system); *Koffsmon v. Green Dot Corp.,* 2021 WL 3473975, at *3 (C.D. Cal. Aug. 6, 2021) (rejecting a lead plaintiff movant group for the same reason).

This is particularly problematic because Mr. Grube's second purchase of Tronox stock, on March 24, 2025, may not be recoverable. According to his certification, his purchase was common stock "acquired on 3/24/2025 via a put option contract assigned on 3/24/2025." *See* Dkt. No. 12-5. As such, Grube's stock purchase presumably originated in the sale of a put option. [1] His certification does not state when the put option was sold. *See id.* If the put option was not sold during the Class Period, he may not claim losses on the 100 subsequently-purchased shares, as he would have been obligated to buy those shares regardless of whether he relied on the defendants' statements. In *Jurkowski v. Molycorp, Inc.*, 2014 WL 12792750 at *2 (S.D.N.Y. Apr. 2, 2014), the court rejected the argument that a purchase of common stock made during the class period, as the result of a put option sale before the class period, was permissible, because the movant "***could not have relied on any actionable misstatements alleged*** [. . .] and therefore cannot seek relief for his subsequent purchase of Molycorp stock." (emphasis added).

---

[1] https://www.schwab.com/learn/story/options-strategy-selling-put-spreads-to-buy-stock ("One main risk of selling put options is that you're obligated to buy the stock at the strike price no matter what happens[.]"

Further, "[movant], however, sold put options before the class period and therefore there is no 'link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Id.* at *3 (internal citation omitted). Therefore, the court held that that movants "claims do not arise from the same event giving rise to relief and therefore are atypical of the class." Without considering the trade at issue, by counsel's calculation, Grube's loss goes from $975 to $475.

Even if Grube sold the put option during the Class Period, his options trade still indicates his inadequacy and atypicality. In *Jaramillo v. Dish Network Corporation, et al.*, 2023 WL 5312062 at *3 (D. Colo. Aug. 16, 2023), the court rejected a movant who purchased stock after the class period pursuant to a put option sale, without even considering if the movant could include the post-class period transaction, on the basis that the movant's "status as [a put option seller] (and the fact that [he] obtained Dish common stock exclusively because the option purchasers exercised these options) raises typicality and adequacy concerns and subjects [him and another movant who sold put options] to unique defenses that preclude their appointment." *Id,* at *3.

The *Jaramillo* court discussed and cited *Di Scala v. ProShares Ultra Bloomberg Crude Oil*, 2020 WL 7698321 (S.D.N.Y. Dec. 28, 2020) and *Cook v. Allergn PLC*, 2019 WL 1510894 (S.D.N.Y. Mar. 21, 2019)), among others, to note the unique challenges facing options investors. *Id*. at *3. *See also Lucid Alternative Fund, LP v. Aehr Test Systems, Inc*., 2025 WL 880251 at *4 (N.D. Cal. Mar. 19, 2025) ("However, the volume and multidirectional nature of [movant's] options trades, in particular its sale of put options, raise legitimate questions about whether [movant] meets the typicality requirement of the PSLRA. Like the disqualified movants in *Cook*, *Di Scala*, and *Jaramillo*, the majority of [movant's] stock losses are directly traceable to its sale

of put options." There is no indication in the Group's joint declaration that Gautier was informed of that issue. If he had, he may not have agreed to such inequitable terms.

Separately, Gautier should submit further biographical information to the Court, as counsel could not confirm his identity and found that someone with the same name, age (as revealed in the Declaration), and who also lives in Redlands, California, appears to have been convicted of drug-related offenses. If that is the movant Gautier in this action, it calls into question his adequacy and typicality. In *The People of the State of California v. Gautier, Dean Anthony*, Case No. POMKA023449-01, it is documented that, in 1994, a person named Dean Gautier was arrested in and charged with felonies relating to the sale and use of narcotics. He was charged with possession of a controlled substance, being under the influence of a controlled substance, and being an unlicensed nonresident distributor of needles/syringes. Later, as documented under Case Number XEAKA023449-01, he may have violated his probation. These two cases are searchable under the number "KA023449-01." While counsel for Mr. Harding is sympathetic to Gautier, if this is the same person, this should have been disclosed if that is the case. Either way, the Group should be forthcoming with information relating to this issue. The Group's joint declaration does not disclose this issue (if it is the same person), and there are no indications that Grube was informed of the issue when he agreed to join the Group. *See* Dkt. No. 12-6.

### c. Group Members Should Not be Considered Individually

The Court should not permit any request by the Group's members to be considered individually as they did not request that any member be appointed as lead plaintiff individually in the event the Court did not appoint the grouping as a whole. *See generally* Dkt. No. 12-1.

11

Courts regularly decline to break up movant groups, refusing to break apart groups where there are no separate motions to appoint an individual group member. *See Jakobsen*, 2019 WL 1522598, at *4 fn. 3. ("There are no separate motions to appoint any member of the [Group] as lead plaintiff on an individual basis. As such, this Court does not consider whether each individual member of the [Group] could be appointed as lead plaintiff."); *see also Marcus v. J.C. Penney Co., Inc.*, 2014 WL 11394911, at *6 (E.D. Tex. Feb. 28, 2014) ("Because [a group member] did not individually submit a motion for lead plaintiff, his consideration for appointment as lead plaintiff rises and falls with the group."); *Tsirekidze v. Syntax-Brillian Corp.*, 2008 WL 942273, at *4 (D.Az. Apr. 7, 2008) ("The [movant group] moved for lead plaintiff as a group and will be evaluated as such. The willingness to abandon the group only suggests how loosely it was put together."); *Abouzied v. Applied Optoelectronics, Inc.*, 2018 WL 539362, at *5 (S.D. Tex. Jan. 22, 2018) ("[W]ithin the Fifth Circuit, courts view with suspicion the hand-picking of group members to serve as sole-lead plaintiff. [. . .] [T]he Court will not consider the suggestion that it select one member of the group. The Court will consider the motion of the collective group.") Accordingly, Group members should not be considered on an individual basis as they didn't request to be considered on such a basis, should the Group's motion fail.

## IV.    MR. HARDING SHOULD BE APPOINTED LEAD PLAINTIFF.

Mr. Harding, with a loss of $202.20, is the presumptive lead plaintiff as he has the largest financial interest remaining and also satisfies Rule 23's typicality and adequacy requirements. As such, he should be selected as lead plaintiff and his selection of lead counsel should be approved.

To overcome the strong presumption entitling Mr. Harding to appointment as Lead Plaintiff, the PSLRA requires "proof" that the presumptive lead plaintiff is inadequate. 15 U.S.C.

§ 78u-4(a)(3)(B)(iii)(II). No such proof exists in this case, and any arguments to the contrary should be flatly rejected. Competing movants may attempt to conjure up speculative arguments to rebut the presumption in favor of Mr. Harding. Any such speculative challenge does not satisfy the PSLRA's requirement that the presumptively most adequate plaintiff may only be rejected if a rival movant presents "proof" that the presumptive Lead Plaintiffs, here Mr. Harding, will not adequately protect the interests of the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 324-325 (S.D.N.Y. 2004) ("[C]onclusory assertions of inadequacy are, however, insufficient to rebut the statutory presumption under the PSLRA without specific support in evidence of the existence of an actual or potential conflict of interest or a [unique defense"); *Sofran v. LaBranche & Co.*, 220 F.R.D. 398, 403-04 (S.D.N.Y. 2004) (emphasizing that the PSLRA requires proof of inadequacy and not mere "speculation").

As Mr. Harding has made a demonstration of his typicality and adequacy and has the largest remaining financial interest, and no movant has rebutted the presumption with proof, he must be appointed Lead Plaintiff.

## V.    MR. HARDING'S SELECTION OF COUNSEL SHOULD BE APPROVED

The PSLRA vests authority in the Lead Plaintiff to select and retain lead counsel, subject to the approval of the Court. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). The Court should interfere with Lead Plaintiff's selection only when necessary "to protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa); *see also In re Molson Coors Brewing Co. Sec. Litig.*, 233 F.R.D. 147, 150 (D. Del. 2005) (the Lead Plaintiff "is primarily responsible for selecting lead counsel.").

Mr. Harding has selected The Rosen Law Firm, P.A. as Lead Counsel. The Firm has the resources and expertise to litigate this action efficiently and aggressively. As the Firm's resume

13

reflects, it is highly experienced in the area of securities litigation and class actions, and has successfully prosecuted numerous securities litigations and securities fraud class actions on behalf of investors (Dkt. No. 10-6). The Court may therefore be assured that by approving Mr. Harding's selection of counsel, the members of the class will receive excellent legal representation. Thus, the Court may be assured that by approving Mr. Harding's selection of counsel, the members of the class will receive excellent legal representation.

**CONCLUSION**

For the foregoing reasons, Mr. Harding's motion should be granted in its entirety and competing motions should be denied.

Dated: November 24, 2025

Respectfully submitted,

**FAXON LAW GROUP, LLC**
/s/Brittany S. Cates (CT27196)
Brittany S. Cates, Esq.
59 Elm Street
New Haven, CT 06510
Telephone: (203) 624-9500
Email: bcates@faxonlawgroup.com

*[Proposed] Liaison Counsel for Movant and the Class*

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*[Proposed] Lead Counsel for Lead Plaintiff and Class*

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Brittany S. Cates
Brittany S. Cates

15