**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MAXWELL KELLER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRONOX HOLDINGS PLC, JOHN D. ROMANO, and D. JOHN SRIVISAL,<br><br>Defendants. | Case No. 3:25-CV-01441-KAD |

**FIRST AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**TABLE OF CONTENTS**

NATURE OF THE ACTION .................................................................................................. 2

JURISDICTION AND VENUE ............................................................................................. 4

PARTIES ................................................................................................................................ 5

    A.    Plaintiffs.......................................................................................................... 5

    B.    Defendants ...................................................................................................... 5

SUBSTANTIVE ALLEGATIONS ........................................................................................ 7

    A.    Background..................................................................................................... 7

    B.    Prior to the Class Period, Countries and Regions Worldwide Sought to Combat Cheap $TiO_2$ Pigment Dumped by Chinese Manufacturers at Anti-Competitive Prices, Creating Opportunity for Western Hemisphere $TiO_2$ Pigment Manufacturing Giants Like Tronox to Absorb ........................................................................................................ 9

    C.    Prior to and Throughout the Class Period, Defendants Closely Tracked and Evaluated Monthly Sales Results and Pricing, Including in Relation to Tronox's Competitors....... 12

    D.    Unbeknownst to Investors, Competitors Like Chemours Were Outcompeting Tronox in Europe for Market Share Beginning in 1Q 2025 ................................................................. 17

DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD........................................................................................... 22

    A.    Materially False and Misleading Statements in the May 1, 2025 1Q 2025 Earnings Presentation and on the 1Q 2025 Earnings Call ................................................................. 23

    B.    Materially False and Misleading Statements in the 1Q 2025 Form 10-Q Filed With the SEC on May 1, 2025 ........................................................................................................... 31

    C.    Defendants' Materially False and Misleading Statements Deceived Investors into Believing Tronox Was Successful in Gaining Market Share, Sales Volumes, and Price Increases in 2Q 2025 ........................................................................................................ 33

DEFENDANTS REVEALED THE TRUTH IN A SET OF DISCLOSURES MADE ON JULY 30, 2025 AND JULY 31, 2025.............................................................................................. 35

ADDITIONAL SCIENTER ALLEGATIONS........................................................................ 39

LOSS CAUSATION................................................................................................................ 41

CLASS ALLEGATIONS ........................................................................................................ 44

PRESUMPTION OF RELIANCE ........................................................................................... 46

NO STATUTORY SAFE HARBOR........................................................................................ 48

COUNT I ................................................................................................................................. 48

COUNT II................................................................................................................................ 51

PRAYER FOR RELIEF .......................................................................................................... 53

DEMAND FOR JURY TRIAL ............................................................................................... 53

1.      Lead Plaintiff Jason D. Smith ("Lead Plaintiff") and Additional Representative Plaintiff John Harding ("Representative Plaintiff" and, collectively, "Plaintiffs") bring this action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of themselves and all persons and entities similarly situated, other than Defendants (defined below), who purchased or otherwise acquired common stock of Tronox Holdings PLC ("Tronox" or the "Company") between May 1, 2025 and July 30, 2025, inclusive (the "Class Period").

2.      Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned attorneys ("Plaintiffs' Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding Tronox; (ii) Defendants' other public statements, including transcripts of interviews Defendants participated in; and (iii) reports of securities and financial analysts, news articles, and other commentary and analysis concerning the Company and the industry in which it operates.

3.      Plaintiffs' Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

**NATURE OF THE ACTION**

4.      This is a classic case of corporate executives attempting a reckless gamble to assure the market that Tronox was competing in its most important market (Europe) at the beginning of 2025—the exact point in time that investors were primed to expect better performance because of the finalization of European anti-dumping duties that allowed Western titanium oxide ("TiO$_2$") pigment manufacturers to reclaim market share—in the hopes that an overall TiO$_2$ market recovery during later quarters of fiscal year 2025 would buoy sales enough to keep concealed that Tronox was being outcompeted from the beginning. To accomplish this scheme, Tronox and its most senior executives, Chief Executive Officer John D. Romano and Chief Financial Officer D. John Srivisal, deliberately misled investors about the Company's financial health, pricing power, and market share. Defendants' fraud as alleged herein caused investors massive losses.

5.      Leading up to the Class Period, Chinese manufacturing capacity expansion and post-Covid supply chain imbalances resulted in an oversupply in the global market for Tronox's core product: TiO$_2$ pigment. Consequently, governments across the world, including the European Union which governed Tronox's largest market, imposed highly publicized anti-dumping duties to protect against cheap Chinese imports of TiO$_2$. This regulatory shift was widely expected to create a massive opportunity for Western TiO2 manufacturers like Tronox.

6.      Eager to project dominance in this newly protected European arena, Tronox assured the market that it was not only capturing this newly available market share but successfully raising prices while doing so. In reality, Tronox was secretly losing a vicious price war, bleeding market share to its primary Western competitor The Chemours Company ("Chemours"), and concealing this deteriorating reality from the investing public.

7.      The Class Period begins on May 1, 2025, when Defendants announced their first

quarter 2025 financial results. During the earnings call and in the accompanying presentation, Defendants presented a highly material and misleading narrative of commercial success. Specifically, Defendants touted: A "stronger-than-normal seasonal demand uplift" led by Europe, which they explicitly attributed to the newly finalized anti-dumping duties; that Tronox had "successfully implemented" price increases in Europe; that the Company was actively "regaining share where we had lost it to the Chinese historically[;]" and that and that price competition was only happening in markets other than Europe.

8.     These statements were highly material to investors. Wall Street analysts immediately seized on these representations, with major firms like Truist Securities and Deutsche Bank publishing reports celebrating Tronox's "partial success implementing price increases in Europe" and its momentum in taking market share. Investors relied on these assurances to justify Tronox's stock price, believing the Company had successfully navigated the competitive landscape to secure lucrative, durable growth.

9.     However, Defendants knew or recklessly disregarded that their statements were materially false and misleading. Throughout the Class Period, Defendant Romano served as Tronox's chief operating decision maker (CODM). In this role, Romano rigorously reviewed competitive pricing analyses, monthly production figures, and detailed sales metrics by geography. Furthermore, Defendants Romano and Srivisal frequently discussed their detailed monitoring of regional pricing and competitive dynamics—including in Europe specifically—in a manner that evidenced their review of the same in at least monthly.

10.     Because of this meticulous internal tracking, Defendants knew that Tronox's primary Western competitor, Chemours, had already implemented a deliberate, aggressive "strategy" to undercut Tronox's prices and seize market share in "fair trade markets" which

3

included Europe. By the time Defendants spoke to investors on May 1, 2025, they already had at least a full month of second quarter internal data proving that Tronox was being outcompeted by Chemours. Put simply: Defendants knew they had priced themselves out of the market, yet they told investors they were successfully raising prices and competing for European market share, and they misleadingly touted such sources of "success" by attributing them as the cause of second quarter financial results while omitting the material threat posed by Chemours.

11.     The truth was revealed on July 30 and 31, 2025, when Tronox released its Q2 2025 financial results. The truth was devastating as Tronox was forced to slash its full year 2025 revenue and Adjusted EBITDA guidance, and to preserve cash the Company announced reduced capital expenditures and a 60% dividend cut. Defendant Romano was finally forced to admit that although Tronox "had some competitive activity where some competitors actually reduced price to move volume" that "we picked, and we lost a little volume there." As a result, the Company's future earning potential was muted because the European price increases that were previously extolled were "going to reverse."

12.     The market reaction was swift and severe. Upon learning that Tronox was actually losing the battle for Europe, the Company's stock price plummeted $1.95 per share—an approximate 38% decline in a single trading day. The stock crashed from $5.14 to $3.19 per share on unusually heavy trading volume, erasing millions of dollars in shareholder value and inflicting massive economic damages on the Class. Plaintiffs now seek damages individually and on behalf of the Class.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.

4

§ 240.10b-5.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

15.     This Court has jurisdiction over each Defendant named herein because each Defendant is an entity or individual with sufficient minimum contacts to this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Tronox is headquartered in this District, with a principal place of business located at 263 Tresser Boulevard, Suite 1100, Stamford, CT 06901.

## PARTIES

### A. Plaintiffs

17.     Lead Plaintiff Jason D. Smith was damaged by purchasing the Tronox common stock as set forth in his Certification of Plaintiff Pursuant to Federal Securities Laws (ECF No. 11-3), which Plaintiffs incorporate by reference herein, at artificially inflated prices during the Class Period, as the result of Defendants' materially false and misleading public statements.

18.     Representative Plaintiff John Harding was damaged by purchasing the Tronox common stock set forth in his Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws (ECF No. 10-4), which Plaintiffs incorporate by reference herein, at artificially inflated prices during the Class Period, as the result of Defendants' materially false and misleading public statements.

### B. Defendants

19.     Defendant Tronox Holdings PLC is a public corporation, organized and existing

5

under the laws of the United Kingdom with its principal place of business located in Stamford, Connecticut. Its common stock trades on the New York Stock Exchange ("NYSE") and is traded under the symbol "TROX."

20.    At all relevant times, Defendant John D. Romano served as Chief Executive Officer of Tronox and also served as a Director on the Company's Board. Additionally, throughout the Class Period Defendant Romano served as the Company's chief operating decision maker ("CODM").

21.    At all relevant times, Defendant D. John Srivisal served as Senior Vice President and Chief Financial Officer of Tronox.

22.    Defendants Romano and Srivisal are collectively referred to herein as "Individual Defendants."

23.    The Company and the Individual Defendants are collectively referred to herein as "Defendants."

24.    The Individual Defendants, by virtue of their high-level positions at Tronox, directly participated in the management of Tronox and were directly involved in the day-to-day operations of Tronox at their highest levels. As such, they were privy to confidential, proprietary information concerning the Company and their business operations, growth, and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

25.    As senior executives at a publicly held company with common stock registered with the SEC and traded on the NYSE, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that

6

were or had become materially misleading or untrue, so that the market price of Tronox's publicly traded common stock would be based on accurate information. Each Individual Defendant violated these requirements and obligations during the Class Period.

26.     As a result of their positions of control and authority as senior executives, the Individual Defendants were able to and did control the content of the public statements issued by Tronox during the Class Period. Each Individual Defendant had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, the Individual Defendants are responsible for the accuracy of the materially false and misleading public statements detailed in this complaint.

27.     As a result of their positions of control and authority as senior executives, the Individual Defendants had access to adverse, undisclosed information about Tronox's business, operations, financial statements, and internal controls through their access to internal corporate documents and conversations with other corporate officers and employees. The Individual Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about the Company materially false and misleading.

SUBSTANTIVE ALLEGATIONS

**A. Background**

28.     Tronox purports to be the world's largest vertically integrated manufacturer of titanium oxide or "$TiO_2$" pigment—meaning it operates and controls all processes from the procurement of raw titanium-bearing mineral deposits through the sale of its pigment products including mining, separation, beneficiation (the process of enhancing the economic value of the titanium deposits by increasing the concentration of titanium), pigment manufacturing, and other processes.

7

29.     $TiO_2$ pigment is used in a wide range of products due to its ability to impart whiteness, brightness, and opacity. "Whiteness" as a physical property refers to how closely a surface reflects all visible light equally, because white light is perceived by the human eye when it detects a balance of all colors of the visible spectrum. "Brightness" as a physical property refers to the visual perception of the intensity of light reflected by an object. "Opacity" as a physical property refers to the object's impenetrability to radiation (such as visible light).

30.     $TiO_2$ pigment is used extensively in the manufacture of paint and other coatings, plastics and paper, and in a wide range of other applications. Moreover, it is a critical component of everyday consumer applications due to its superior ability to cover or mask other materials effectively, and efficiently, relative to alternatives. Throughout the Class Period, Defendants represented that there were no effective substitutes for $TiO_2$ pigment for consumer applications, because no other white pigment has the physical properties for achieving comparable opacity and brightness or can be incorporated as cost effectively.

31.     $TiO_2$ pigment's use in coatings that are necessary in the architectural, automotive, and general industrial end markets means that, under normalized conditions, Tronox experiences— and investors expect—seasonally higher demand, sales volumes, and cash flows in the Company's second and third fiscal quarters when regions in the northern hemisphere experience spring and summer and increased associated painting activity.

32.     In addition to $TiO_2$ pigment, Tronox sells various co-products and by-products of the $TiO_2$ mining and refining processes, including zircon, pig iron, and monazite.  However, throughout the Class Period, the Company operated under one operating and reportable segment: its "Tronox" segment. Nonetheless, in every quarterly and annual SEC report, the Company disaggregated its net revenue by product type and geographic area.

8

33.     However, as shown in **Figure 1** below, leading up to and throughout the Class Period, the Company's business has been overwhelmingly dominated by $TiO_2$ net sales:

**Figure 1**

|         | 1Q 2024 | 2Q 2024 | 3Q 2024 | 4Q 2024 | 1Q 2025 | 2Q 2025 |
|---------|---------|---------|---------|---------|---------|---------|
| **TiO₂** | $605MM | $653MM | $616MM | $533MM | $584MM | $587MM |
| **Zircon** | $88MM | $85MM | $74MM | $75MM | $69MM | $68MM |
| **Other** | $81MM | $82MM | $114MM | $68MM | $85MM | $76MM |

34.     Furthermore, as shown in **Figure 2** below, leading up to and throughout the Class Period, the Company's business has been led by European net sales, with Tronox's EMEA (Europe, Middle East and Africa) region outpacing all others:

**Figure 2**

|         | 1Q 2024 | 2Q 2024 | 3Q 2024 | 4Q 2024 | 1Q 2025 | 2Q 2025 |
|---------|---------|---------|---------|---------|---------|---------|
| **EMEA** | $309MM | $308MM | $332MM | $242MM | $312MM | $299MM |
| **North America** | $192MM | $222MM | $212MM | $170MM | $198MM | $207MM |
| **Asia Pacific** | $227MM | $239MM | $206MM | $207MM | $182MM | $184MM |
| **South & Central America** | $46MM | $51MM | $54MM | $57MM | $46MM | $41MM |

35.     Indeed, on July 31, 2025, during a conference call jointly presented by Defendants Romano and Srivisal to report earnings for the quarter ended June 30, 2025 (the "2Q 2025 Earnings Call"), Defendant Romano acknowledged that Europe was a "key" market for the Company during the Class Period.

**B.     Prior to the Class Period, Countries and Regions Worldwide Sought to Combat Cheap TiO₂ Pigment Dumped by Chinese Manufacturers at Anti-Competitive Prices, Creating Opportunity for Western Hemisphere TiO₂ Pigment Manufacturing Giants Like Tronox to Absorb**

36.     Aided by enormous titanium-bearing feedstocks, industrial wages approximately 70% to 80% lower than Western counterparts (and fewer environmental controls), cheap raw materials and electricity prices, and economies of scale from its developed manufacturing base, Chinese companies over the past twenty years have expanded aggressively into mining heavy

9

mineral sands containing titanium-bearing raw materials like ilmenite, and upstream manufacturing, resulting in an extreme level of vertical integration that transformed a worldwide titanium supply chain into one increasingly centered on China.

37.    Indeed, where Chinese companies' $TiO_2$ manufacturing capacity represented approximately one percent of global requirements in 2000, it ballooned to over fifty-five percent of global demand in 2024.

38.    China's rise in $TiO_2$ pigment manufacturing leading up to the Class Period coincided with production retrenchment for other global manufacturers whose manufacturing capacity historically has been tied to boom and bust macroeconomic cycles.

39.    Because $TiO_2$ pigment's end-use applications (*e.g.*, primers and paint coatings) are heavily dependent on prevailing economic conditions, the $TiO_2$ pigment industry has historically experienced cyclical pricing volatility where producers expand capacity when prices are high, leading to eventual periods of low utilization and compressed margins once supply exceeds demand. As an example, in 2011, aggressive pricing behavior from producers drove prices to what remains a peak at ~$5,000 per metric ton in mid-2012, which in turn led to significant capacity expansion, particularly in China – this drove an industry-wide pricing trough from mid-2012 through early 2016, at which point most major producers were operating at a loss.

40.    As global demand surged following the Covid-19 pandemic—including for products containing $TiO_2$ pigment—and much of the world experienced a well-publicized supply chain shock, $TiO_2$ pigment manufacturers increased production and many such companies outside of China (including Tronox and Chemours) increased prices. Simultaneously, Chinese $TiO_2$ pigment manufacturers who were growing their capacity, were decelerating $TiO_2$ pigment sales

10

domestically in China due to a cooling Chinese real estate market and looking to export product to overseas buyers.

41.    Thus, in late 2022 and early 2023, as post-pandemic demand declined, the combination of increased global manufacturing capacity that exceeded demand and cheaper, available Chinese $TiO_2$ pigment, ushered in another cyclical demand trough.

42.    Beginning in 2023 and afterward, many country and territorial governments instituted anti-dumping duties on Chinese $TiO_2$ pigment manufacturers to protect companies within their territorial limits. For example, on January 9, 2025, the European Commission (the executive arm of the European Union) imposed final duties on Chinese $TiO_2$ pigment manufacturers like LB Group (*i.e.*, Lomon Billions) and Anhui Jinhe Star (*i.e.*, Anhui Gold Star Group). *See* Commission Implementing Regulation (EU) 2025/4.

43.    In an Equity Research Report initiating coverage on Tronox dated January 27, 2025, analyst Truist Securities summarized recent global anti-dumping duties on Chinese firms as follows:

Summary of anti-dumping activities against Chinese exports

Several jurisdictions are in the process of exploring placing anti-dumping duties on imports from China, which we believe have the potential to support improved volumes in 2025-26 for Western producers above overall market growth, as well as to support our expectations for higher-trending TiO2 prices. Jurisdictions recently implementing or pursuing the implementation of incremental anti-dumping provisions include:

- **Brazil:** In October 2024, Brazil announced preliminary anti-dumping duties on Chinese TiO2 producers ranging from $578-$1,773/MT. This is a provisional measure intended to last six months, with a final ruling scheduled to be announced in April 2025. 6% of TROX production capacity is located in Brazil.
- **European Union:** In July 2024, the European Commission (EC) imposed provisional six-month antidumping duties on imports from Chinese TiO2 producers based on a % of the import price. Final antidumping duties, ranging from €0.25 to €0.74 per kg (highest rate applies to LB Group), were

11

ratified in November 2024 and will be effective for five years beginning in January 2025. 27% of TROX capacity is located in Europe.

- **Saudi Arabia:** In October 2024, the Saudi General Authority of Foreign Trade launched an anti-dumping investigation into TiO2 imports from China. 19% of TROX production is based in Saudi Arabia.
- **India:** In March 2024, the government of India initiated an investigation into potential anti-dumping actions against Chinese producers – the investigation is ongoing.
- **Eurasian Economic Union:** In August 2024, the EAEU (consisting of Russia, Armenia, Belarus, Kazakhstan, Kyrgyzstan) implemented anti-dumping duties for a period of five years on Chinese producers, at a rate ranging from 14.3-16.25%.

44. As these anti-dumping duties rolled out, including in Europe, Defendants monitored the immediate effects. For example, on August 2, 2024, speaking during the Company's earnings call for the second fiscal quarter of 2024 for himself and Defendant Srivisal (his joint presenter), Defendant Romano spoke about the global demand environment and the effect of anti-dumping legislation stating, in pertinent part: "In addition to the [demand] recovery, we've also seen the launch of several anti-dumping investigations. Most notably, the EU announced a provisional duty last month on Chinese imports, while Brazil and India each have investigations underway. We believe these efforts will be a benefit in the medium and long-term, and *we will continue to monitor the short-term impacts from these announcements*."

45. Accordingly, with tariff protection from Chinese imports, Western TiO$_2$ pigment manufacturers rushed to compete for market share in territories where anti-dumping duties went into effect—including the large and important European market, and the Individual Defendants were vigilant of the results, including with line of sight into "short-term impacts[.]"

**C. Prior to and Throughout the Class Period, Defendants Closely Tracked and Evaluated Monthly Sales Results and Pricing, Including in Relation to Tronox's Competitors**

46. In response to numerous accounting scandals in the 1990s and 2000s, Congress passed the Sarbanes Oxley Act of 2002 ("SOX"). SOX authorized the SEC, in pertinent part, to

12

recognize generally accepted accounting principles ("GAAP") established by a standard-setting body meeting certain criteria, as the SEC "deems necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. §7218(b); 15 U.S.C. § 77s(b). In response, the SEC reaffirmed the Financial Accounting Standards Board ("FASB") as the designated GAAP standard setter and implemented Regulation S-X requiring publicly traded companies to prepare financial statements in accordance with GAAP. SEC Release No. 33-8221/Financial Reporting Release No. 70 ("*Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter*"); 17 C.F.R. § 210.4-01(a)(1).

47.     The FASB's Accounting Standards Codification ("ASC") require the disclosure of a chief operating decision maker ("CODM") for each operating segment within a publicly traded company who will "regularly review[]" operating results "to make decisions about resources to be allocated to the segment *and assess its performance*." §§ 280-10-50-1, 280-10-50-21(c).

48.     Before and throughout the Class Period, Tronox designated Defendant Romano as the Company's CODM for its lone Tronox operating segment. Defendants acknowledge that in this role, throughout the Class Period, Defendant Romano received "monthly" information containing production figures, refreshed future sales forecasts intended to "monitor" against actual results, and financial metrics (including the sales forecasts) that Defendant Romano used to perform monthly "competitive analysis" in order to benchmark Tronox's performance against its competitors. Indeed, in the Company's annual report filed with the SEC on Form 10-K on February 19, 2025 (the "2024 Form 10-K"), Defendants admitted, in pertinent part:

> The Company's chief operating decision maker ("CODM"), who is the CEO, reviews financial information presented at the consolidated level and decides how to allocate resources based on financial metrics, including net income. In addition to these financial metrics, the CODM also reviews *monthly* production figures *along with future global sales demand forecasts to make decisions about ongoing production levels and how to allocate resources*. The measure of segment assets is

13

reported on the balance sheet as total consolidated assets. The CODM uses such financial metrics, including net income, to evaluate income generated from segment assets (return on assets) in deciding whether to reinvest profits into the segment or into other parts of the organization, such as working capital needs, mandatory and discretionary capital expenditures, servicing our interest and debt repayment obligations, cash taxes, and making pension contributions.

Net income, other financial metrics, production costs and *sales forecasts are used to monitor budget versus actual results. The CODM also uses these financial metrics as a percentage of sales in competitive analysis by benchmarking to Tronox's competitors. The competitive analysis along with the monitoring of budgeted versus actual results are used in assessing performance of the segment* and in establishing management's compensation. The reported segment revenue, segment profit or loss and significant segment expenses are the same as the consolidated results disclosed on the consolidated statement of operations, except as noted below. As noted above, *the CODM also determines how to allocate resources through his review of monthly production / manufacturing costs*.

49.    According to Tronox's 2024 Form 10-K, Tronox considers the following as its competitors: "We face competition from global competitors with headquarters in Europe, the United States and China, including *Chemours*, LB Group, Kronos Worldwide Inc., INEOS, and Venator. In addition, we compete with numerous regional producers particularly in Eastern Europe and China."

50.    Furthermore, Defendants repeatedly stated publicly that throughout the Class Period, they tracked Tronox's pricing (a key determinant of the Company's sales) by region and in relation to competitors, such that a competitive pricing analysis was already available and reviewed by Defendants Romano and Srivisal on the last day of a month.

51.    For example, during the 2Q 2025 Earnings Call, Defendant Romano was asked a question by a Morgan Stanley & Co. LLC analyst about "increased pressure" on pricing from competitors in Europe. Defendant Romano admitted that as of that day (the last day in July 2025), "we" (*i.e.*, he and his only co-presenter on the call—Defendant Srivisal) "already know what happened in July" in relation to European demand and pricing:

14

**Justin Pellegrino**

Okay, that makes sense. And then just one follow-up. You noted that *you saw the bit of increased pressure* [from competitors] *in Europe in 2Q*. Can you just give us an idea of what you're thinking about sequentially for Europe as it relates to *demand for product as well as price?* Just as those duties are still in play, given the increase we saw in Q1, then kind of followed by the decrease in Q2, what are you thinking of sequentially for Q3?

**John D. Romano**

Yeah, so we don't -- I'm not going to provide a guide on pricing by region, but I will say that factored into the guide for Q3, there's 2% to 3% move on price, on the downside, that's in the guide. When we start thinking about Europe, in general, we're not seeing a tremendous amount of downward movement. It's more in line -- it's a holiday season right now, *so August is typically a low month, but we already know what happened in July,* and September is forecasted to move in the right zone.

52.    Likewise, on May 1, 2025, during a conference call jointly presented by Defendants Romano and Srivisal to report earnings for the quarter ended March 31, 2025 (the "1Q 2025 Earnings Call"), Defendant Romano was asked a question by an Alembic Global Advisors LLC analyst about purported "pricing momentum" in Europe. Acknowledging that the Individual Defendants did not speak much about the second quarter specifically because the Company provided full-year guidance, Defendant Romano nevertheless demonstrated that as of that day "we" (again, he and Defendant Srivisal) understood what was happening with respect to Tronox's pricing and competitors' pricing during the second quarter, which had started just one month prior:

**Hassan I. Ahmed**

I just wanted to revisit – thanks so much. So just wanted to revisit the sort of bunch of questions about the full year guidance. I mean, if I am understanding what you guys said correctly, you know, particularly as it pertains to the second half being stronger than the first half, you know, part of it is predicated on sort of lower cost tons because of the shutdown of Botlek. Part of it is, you know, the cost cutting program sort of getting into effect.

But if I heard correctly, you guys also mentioned, you know, gaining pricing momentum. So I'm just trying to sort of reconcile that, that historically, obviously, as we move away from the seasonally strong time period, you know, which tends to be the, call it, spring/summer time period, it gets harder and harder for the

15

industry to get that pricing. So I'm just trying to assess, you know, what gives you that comfort level that you will indeed get that pricing in the second half?

**John D. Romano**
Yeah. Thanks, Hassan. It's a great question. ***We didn't talk too much in prepared comments about what's going on in the second quarter*** because we provide guidance for the full year, ***but we are getting price in Europe***. So when we think about our second quarter, historically, you go eight quarters with continual price erosion, 1% to 2% a quarter. It takes a little bit of time to get traction on a price increase. And we did announce a price increase in Europe in the second quarter and we have successfully implemented a portion of that.

***So when we think about our second quarter price***, ***there's still some competitive activity in other regions***, so that's puts and takes on where we are on price. But I would say our price will be flat to slightly up this quarter, depending upon how we manage some of this competitive activity. But we are getting pricing in Europe. And when we think about, is that a demand profile increase? No. That's due to a shift in the supply base.

53.    Similarly, on February 13, 2025, during a conference call jointly presented by Defendants Romano and Srivisal to report earnings for the year and quarter ended December 31, 2024 (the "4Q 2024 Earnings Call"), Defendant Romano was asked a question by a BMO Capital Markets Corp. analyst about the "pricing environment" in Europe. Defendant Romano again acknowledged that as of that day "we" (he and Defendant Srivisal) understood the competitive dynamics of pricing "movement" by geography "in the first quarter" which had started a little over one month prior:

**John McNulty**
So, a ***question on the pricing environment. Can you speak to what's driving what sounds like slightly softer pricing in the first half of the year***, especially given that we do have some of the tariffs in place now? And I would have thought that would have at least contributed a little bit to an improving pricing environment. So, can you help us to think about that and also speak to maybe some of the competitive issues that you – that you've alluded to in the prepared remarks?

**John D. Romano**
Yeah. Thanks, John. So, when we think about -- again, we're providing annual guidance, so we're not going to provide a lot on the quarter. But ***when we think about pricing*** and kind of the cadence that happened in the fourth quarter, ***we're talking about this similar kind of movement in the first quarter. So, it's not a***

*significant move, but there is a lot of, I would say, competitive activity in certain regions of the world* and we're responding to that where we feel there's critical market share that we don't want to lose. That being said, there's also some opportunities where we've gotten some price increases.

And as we think about what's happening in Europe with regards to the traction we're starting to get from some of the activity that's happened from duties, you've already probably seen some other competitors have announced increases, and we would expect that we'll start to see an opportunity for that to happen. But again, it's that recovery period. As the market starts to recover, it's going to be a little bit slower. And as the market starts to pick up, and we mentioned in the prepared comments that there was some other duty activity that's happening in India now where we would expect to see definitive duties possibly as early as the second quarter, we'll start to see opportunities for price movement.

54.     Later during the 4Q 2024 Earnings Call, a JPMorgan Chase & Co. analyst asked Defendant Romano to provide additional color regarding which regions were presently seeing price increases. In response, Defendant Romano again acknowledged Defendants' then-present insight as to the intra-quarter results, stating, in pertinent part:

**Jeffrey J. Zekauskas**
Which are the geographic regions where prices are going down and which of the geographic regions where prices are going up?

**John D. Romano**
Yeah. We don't typically provide a lot of guidance on regional pricing, but I'll give you some color. As I mentioned, in Europe, we have seen some competitive activity on pricing. And at the same time, in some areas in Europe, we're starting to get price traction. So, Brazil, we're starting to see some opportunities to move price in the upwards direction. *So, in the first quarter, I'd say, it's a bit of a mix*.

55.     Accordingly, Defendants disclosed publicly throughout the Class Period that Defendants Romano and Srivisal were able to review pricing results by geography, and in relation to competitors, on a monthly basis and analyze how that affected demand, sales, and sales forecasts, among other financial metrics.

**D. Unbeknownst to Investors, Competitors Like Chemours Were Outcompeting Tronox in Europe for Market Share Beginning in 1Q 2025**

56.     During the 4Q 2024 Earnings Call, Defendants announced that in response to

17

European Commission's anti-dumping duties, they would be able to see better pricing (*i.e.*, that Tronox could raise prices) in its key European market. Specifically, when asked by analysts about pricing opportunities given the tariff relief, Defendants responded that Tronox had already raised prices in Europe in 1Q 2025. For example, responding to a BMO Capital Markets analyst, Defendant Romano differentiated Europe from places where the Company would see pricing competition, and represented Tronox had already raised prices in Europe, stating, in pertinent part:

> **John McNulty**
> So, a question on the pricing environment. Can you speak to what's driving what sounds like slightly softer pricing in the first half of the year, ***especially given that we do have some of the tariffs in place now? And I would have thought that would have at least contributed a little bit to an improving pricing environment***. So, can you help us to think about that and also speak to maybe some of the competitive issues that you – that you've alluded to in the prepared remarks?
>
> **John D. Romano**
> Yeah. Thanks, John. So, when we think about -- again, we're providing annual guidance, so we're not going to provide a lot on the quarter. But when we think about pricing and kind of the cadence that happened in the fourth quarter, we're talking about this similar kind of movement in the first quarter. So, it's not a significant move but there is a lot of, I would say, competitive activity in certain regions of the world. And we're responding to that where we feel there's critical market share that we don't want to lose. That being said, ***there's also some opportunities where we've gotten some price increases***
>
> ***And as we think about what's happening in Europe with regards to the traction we're starting to get from some of the activity that's happened from duties***, you've already probably seen some other competitors have announced increases, and we would expect that we'll start to see an opportunity for that to happen. But again, it's that recovery period. As the market starts to recover, it's going to be a little bit slower. And as the market starts to pick up, and we mentioned in the prepared comments that there was some other duty activity that's happening in India now where we would expect to see definitive duties possibly as early as the second quarter, we'll start to see opportunities for price movement.
>
> But it's a bit of a mix where we're protecting some share in some areas, ***but we're also getting price.*** It's not a significant move. I guess the point is there's still a little downward movement where we would expect upward movement in the second half.

18

57. Defendants were pressed for further detail about price increases by a JPMorgan Chase analyst during the 4Q 2024 Earnings Call, and Defendant Romano again, touted Tronox's price hikes during the "first quarter" encouragingly, stating: "As I mentioned, in Europe, we have seen some competitive activity on pricing. ***And at the same time, in some areas in Europe, we're starting to get price traction***. So, Brazil, we're starting to see some opportunities to move price in the upwards direction. So, ***in the first quarter***, I'd say, it's a bit of a mix."

58. At the same time, Chemours, one of Tronox's Western competitors vying for market share ceded by Chinese manufacturers, was already executing an orchestrated "strategy" that Chemours would implement when European Union anti-dumping duties went into effect designed to gobble up market share by underpricing firms like Tronox.

59. Indeed, on August 6, 2025, after the Class Period, Chemours held a conference call with securities analysts to discuss Chemours' 2Q 2025 results (the "2Q 2025 Chemours Call"). During the 2Q 2025 Chemours Call, Denise M. Dignam, Chemours' President, CEO, and Director, disclosed that in 2Q 2025, Chemours' $TiO_2$ business "delivered overall results ahead of our previous guidance with sequential net sales up 10%, supported by increased volumes of 9% paired with overall flat pricing. In this weaker demand environment, ***our team executed well***, securing increased volumes across all of our regions."

60. During the question-and-answer portion of the 2Q 2025 Chemours Call, Ms. Dignam explained that Chemours' $TiO_2$ "***strategy***" since "we started this" was to compete aggressively in "fair trade markets" *i.e.*, in markets like Europe that had enacted anti-dumping duties that opened up market share previously owned by low-cost Chinese manufacturers. For example, in response to a question from a Goldman Sachs analyst about Chemours' "biggest competitor, Western competitor" (Tronox), Ms. Dignam stated:

19

**Duffy Fischer**

Yeah. Good morning. I was hoping you could talk first about what your strategy is in TiO2 currently? Historically, you've been stronger on price and have given up volume to peers in weak periods. ***This quarter, if you look, your pricing year-over-year was 4% weaker than your biggest competitor, Western competitor, your volumes were 10% better. So, it's pretty clear you are much more aggressive in the market than they were this quarter.*** Is that a structural change in your strategy to be more volume-driven? And if so do you think there will be a competitive response from them?

**Denise M. Dignam**

Thanks for the question, Duffy. I mean we are really confident and clear ***in our strategy and when we started this*** we really looked at we need to be lowest cost manufacturer. We took out our high-cost capacity and we talked about the fact that we are going to continue to do that in our assets and ***we're going to gain share in fair trade markets***. We look whenever we have an opportunity, we have a very diligent process. We evaluate all opportunities. ***I'm confident in our strategy to*** driving lower cost and ***achieving share gain in those fair trade markets***. I really can't comment on what the response of the competitors will be. But I think it's been really positive signs when you think about what's going on with the capacity that's been taken out of the market. We believe there's at least 400 kilotons that have been taken out. And just even looking at the export data from China, significant reductions year-over-year, quarter-over-quarter, even into Brazil and in India [which] still do not have the firm duties or tariffs in place. ***So again we're focused on lowest cost and gaining share in fair trade zones***.

61.     Later during the 2Q 2025 Chemours Call, an analyst from Alembic Global Advisors summarized the "battle[]" between Tronox and Chemours in 2Q 2025, stating:

I just wanted to revisit the earlier question, get a little more granular around [TiO2] and the 9% sequential uptick you guys saw in volumes ***versus one of your largest competitors*** sequentially reporting a 2% decline. ***I mean my understanding is that that Europe sort of became the battleground, with the whole sort of antidumping stuff going on over there. And it just seems that you guys were very aggressive on pricing***.

62.     Ms. Dignam rejected that Chemours would further compete for market share by "dropping" prices from where they were, but acknowledged Chemours' "***strategy***" had been to focus on "winning in the marketplace[,]" which necessarily meant out-pricing competitors like Tronox.

20

63.    The "strategy" Ms. Dignam repeatedly referred to was a multi-pronged strategic plan titled "Pathway to Thrive" that Chemours had discussed in each of its quarterly earnings announcements since November 4, 2024, when Chemours announced results for the third quarter ended September 30, 2024. Thus, When Ms. Dignam stated that Chemours had been "***clear in our strategy and when we started this***" with respect to the twin goals of lowering costs and "gain[ing] share ***in fair trade markets***[,]" she was referring to a consistent and orchestrated plan from the outset of the Pathway to Thrive initiative to take advantage of anti-dumping legislation and immediately compete for market share.

64.    The existence of this market share and pricing "strategy" even *before* the Class Period is obvious from Chemours' and Ms. Dignam's earlier statements. For example, on February 18, 2025, during Chemours' earnings call reporting results for the fourth quarter and year end of 2024, Ms. Dignam explained that Chemours' "strategy' of gaining market share for $TiO_2$ pigment, in areas like Europe who had enacted anti-dumping duties, was already underway, stating in pertinent part, "We also see green shoots in our TT [$TiO_2$] business, and we're really laser focused on delivering on Pathway to Thrive…..[w]hen we talk about some of the green shoots we're seeing, ***it's really around some share gain that we're seeing in Europe***. I would say it's still early days as you think about the antidumping impact."

65.    Similarly, on May 7, 2025, just six days after Defendants' false and misleading statements alleged herein and during Chemours' earnings call reporting results for the first quarter of 2025, Ms. Dignam refused to talk about "forward pricing" for $TiO_2$ pigment, but referred to Chemours' strategy of competing in "fair trade" zones as already having been successful in the first quarter in gaining market share. Specifically, Ms. Dignam stated the following, in response to a Truist Securities analyst:

21

**Peter Osterland**
First, I just wanted to ask on $TiO_2$ pricing. How have $TiO_2$ prices been trending in the more regulated markets where you're seeing stronger volume growth? Was any of the sequential decline for pricing in the first quarter in those markets? And what are you expecting from pricing in those markets in the second quarter and beyond?

**Denise M. Dignam**
So thanks, Pete, for the question. We really don't want to talk about forward pricing. What I can tell you is that we see stabilization in the -- what we're calling the fair trade markets. We see stabilization in price and we see actually -- *we've had volume increases in those markets as well*.

66.     Thus, with Tronox deploying price increases in Europe at very latest by February 13, 2025, when Defendants held the 4Q 2024 Earnings Call, and Chemours simultaneously deliberately having developed and deployed a "strategy" to take advantage of competitors whose prices were higher in the immediate wake of the European anti-dumping duties becoming final (which began in January 2025), Tronox was necessarily pricing its $TiO_2$ pigment above market rates for months (and consequently, losing market share) before the beginning of the class period on May 1, 2025.

67.     Because Defendants admittedly performed "competitive analysis" of Tronox's sales performance each month, such that the Individual Defendants actually knew such results as of the close of every month, Defendants knew as of May 1, 2025 (the first day of the Class Period) that Tronox was being outcompeted by Chemours throughout April 2025 in the race to attain $TiO_2$ market share in Europe.

## DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

68.     Throughout the Class Period, Defendants made materially false and misleading statements concerning Tronox's European $TiO_2$ demand, pricing, market share, sales volumes, and revenue. These misrepresentations created the misimpression that the European Union's final anti-dumping rules allowed Tronox to successfully sustain higher prices and compete for share in

Europe, while omitting the highly material facts that competitors like Chemours had deployed a "strategy" to decrease prices as soon as the rules when into effect, and as a result, Tronox was experiencing pressure on its demand, pricing, market share, sales volumes, and revenue.

69.     Plaintiffs assert that all statements set forth below that are designated with yellow highlights (added within misleading slide presentations) or bolded and underlined (**example**) were materially false and/or misleading for the reasons set forth therein when made. Non-bolded and underlined statements are included for context.

### A. Materially False and Misleading Statements in the May 1, 2025 1Q 2025 Earnings Presentation and on the 1Q 2025 Earnings Call

70.     The Class Period begins on May 1, 2025, when Defendants disclosed the Company's results for the first quarter ending March 31, 2025. That morning, before the market opened, the Individual Defendants held the 1Q 2025 Earnings Call Along with the transcript of the 1Q 2025 Earnings Call, Defendants also uploaded a presentation to the Company's Investor Relations webpage (the "1Q 2025 Earnings Presentation").

71.     In the 1Q 2025 Earnings Presentation, Defendants made a series of representations generating the materially false impression that, despite an entire third of 2Q 2025 (during which Defendants admit Tronox was being outcompeted regarding European market share) already having expired, and Chemours already executing its "strategy" of outcompeting with Western manufacturers like Tronox for European market share since at least February 2025, Tronox was successful in absorbing European market share and enacting durable, market-rate price increases.

23

72.    Specifically, the 1Q 2025 Earnings Presentation contained the following slides:

## Key Messages from the Quarter
### Strategic Actions to Mitigate Macroeconomic Challenges



- Stronger than normal seasonal demand uplift in $TiO_2$ volumes, increase of 12% QoQ
  - Europe bolstered by anti-dumping duties – sales volumes not seen since Q2 2021
  - Increased competitive activity in Latin America, Middle East, and Asia
- Zircon volumes decline of 6% QoQ impacted by continued weaker demand
- $TiO_2$ and zircon QoQ pricing decline of 2% each, in-line with expectations
- Production costs higher than expected, primarily due to lower operating rates at Botlek and increases in direct material prices
- Remained steadfast in focus on cost reduction and drive lower SG&A
- Strategic actions taken in first quarter to deliver cost improvements from 2026 onwards:
  - Announced idling of Botlek pigment plant, expected to significantly improve free cash flow in 2025 and EBITDA improvement of +$30M from 2026 onwards
  - Continued execution cost improvement program to deliver $125-175M in sustainable, run-rate cost improvements by end of 2026
  - Capital investments in mining projects on track to improve mining cost profile by $50-60M in 2026

**TRONOX**    Tronox Holdings plc | tronox.com | Confidential & Proprietary | © 2025                                    4

## First Quarter 2025 Financial Highlights

- Revenue increased QoQ driven by higher $TiO_2$ sales volumes, partly offset by lower zircon volumes and unfavorable pricing from zircon and $TiO_2$
- Loss from operations of $61M; Net loss attributable to Tronox of $111M including $87M of restructuring and other charges, primarily non-cash relating to the idling of Botlek
- Tax expense of $5M due to losses in jurisdictions where we do not realize tax benefits
- Adjusted diluted loss per share of $0.15
- Adjusted EBITDA of $112M; Adjusted EBITDA margin of 15.2%
- Capital expenditures of $110M
- Free cash flow was a use of $142M

|  | Q1 '25 | Q1 '24 | YoY % Δ | Q4 '24 | QoQ % Δ |
|---|---|---|---|---|---|
| Revenue | $ 738 | $ 774 | (5)% | $ 676 | 9% |
| (Loss) Income from Operations | $ (61) | $ 41 | n/m | $ 48 | n/m |
| Net (Loss) Attributable to Tronox | $(111) | $(9) | n/m | $(30) | n/m |
| GAAP Diluted (Loss) per share | $(0.70) | $(0.06) | n/m | $(0.19) | n/m |
| Adjusted Diluted (Loss) Income per share | $(0.15) | $(0.05) | n/m | $0.03 | n/m |
| Adjusted EBITDA | $ 112 | $ 131 | (15)% | $ 129 | (13)% |
| Adj. EBITDA Margin % | 15.2% | 16.9% | (170)bps | 19.1% | (390)bps |
| Free Cash Flow | $(142) | $(105) | n/m | $(35) | n/m |

*Note: All figures are US$ in millions unless otherwise noted. Comparisons are year-over-year unless otherwise stated. Bridge amounts may not add across due to rounding.*

**TRONOX**    Tronox Holdings plc | tronox.com | Confidential & Proprietary | © 2025                                    5

24



73.    The foregoing statements were materially false and misleading when made because: (i) Defendants falsely touted incremental growth in "European demand[,]" European $TiO_2$ sales volumes, and European $TiO_2$ revenue due to the "anti-dumping duties" as a "[h]ighlight[]" and in a misleadingly rosy light, without disclosing the material fact that Chemours was simultaneously successfully executing a strategy of outcompeting Tronox for sales volumes and market share, and the attendant revenues therefrom; (ii) by touting "[h]igher growth in Europe" and separately excluding Europe from areas of "increased competitive activity[,]" Defendants generated a materially false impression that Tronox was not then experiencing price and market share competition, which it was because of Chemours' strategy in "fair trade" markets; (iii) Defendants falsely represented $TiO_2$ pricing headwinds as "anticipated" when, in reality, Defendants were losing a price war that resulted in Tronox being outcompeted for valuable European market share and jeopardized the price increases that Tronox had just instituted in that market; and (iv) Defendants misleadingly put $TiO_2$ "pricing pressure" at issue without disclosing

25

thematerial fact that the pricing headwinds were occurring in Europe, where Tronox had recently touted as a region supporting price increases.

74.    During the 1Q 2025 Earnings Call, in prepared remarks, Defendants Romano and Srivisal made materially false and misleading statements explaining the materially false and misleading slides contained in the 1Q 2025 Earnings Presentation. Specifically, the Individual Defendants stated, in pertinent part:

> **John D. Romano**
> Thanks, Jennifer, and good morning, everyone. **We'll begin this morning on slide 4 with some key messages from the quarter. We realized a stronger than normal seasonal demand uplift in TiO$_2$ volumes in Q1 with an increase of 12% from the Q4 of 2024. Europe led the sequential growth bolstered by anti-dumping duties. We are beginning to see the expected benefits from the duties that were finalized in the EU in January, resulting in sales volumes recovering to levels not seen since the second quarter of 2021 in Europe.** North America also realized stronger seasonable trends **while competitive activity in Latin America, the Middle East, and Asia continued to exert pressure on sales.** Zircon sales were lower, both compared to the prior year and sequentially due to a slower start in China as expected. **Additionally, despite increased competitive dynamics across all products, average pricing for the quarter came in as anticipated with TiO$_2$** and Zircon **both down 2% sequentially** ….
>
> **D. John Srivisal**
> Thank you, John. **Turning to slide 5. We generated revenue of $738 million, an increase of 9% sequentially driven primarily by higher TiO$_2$ sales volumes**. Loss from operations was $61 million in the quarter. We reported net loss of $111 million, which includes $87 million of restructuring and other charges, primarily non-cash costs relating to the idling of Botlek. While our loss before taxes was $106 million, our tax expense was $5 million in the quarter as we do not realize tax benefits in jurisdictions where we are realizing losses. Adjusted diluted earnings per share was a loss of $0.15. Adjusted EBITDA in the quarter was $112 million and our adjusted EBITDA margin was 15.2%. Our free cash flow was a use of $142 million, including $110 million of capital expenditures. Now, let's move to the next slide for a review of our commercial performance. **TiO$_2$ revenues decreased 3% versus the year-ago quarter, driven equally by** a 1% decreases in sales volumes, **price including mix**, and unfavorable exchange rates. **Sequentially, TiO$_2$ revenues increased 10% as a higher than typical seasonal demand uplift drove a 12% increase in volumes led by European demand, as John referenced earlier. This was partially offset by a 2% decrease in average selling prices, including mix**.

75.    The foregoing statements were materially false and misleading when made because: (i) Defendants falsely touted incremental growth in European demand, European $TiO_2$ sales volumes, and European $TiO_2$ revenue due to the "anti-dumping duties" as a "key message[]" and in a misleadingly rosy light, without disclosing the highly material fact that Chemours was simultaneously successfully executing a strategy of outcompeting Tronox for sales volumes and market share, and the attendant revenues therefrom; (ii) by touting European growth and "the expected benefits" of Europe's anti-dumping duties, and separately excluding Europe from areas of increased "competitive activity[,]" Defendants generated a materially false impression that Tronox was not then experiencing price and market share competition, which it was because of Chemours' strategy in "fair trade" markets; (iii) Defendants falsely represented $TiO_2$ pricing headwinds as "anticipated" when, in reality, Defendants were losing a price war that resulted in Tronox being outcompeted for valuable European market share and jeopardized the price increases that Tronox had just instituted in that market; and (iv) Defendants misleadingly put $TiO_2$ pricing pressure at issue without disclosing the highly material fact that the pricing headwinds were occurring in Europe, where Tronox had recently touted as a region supporting price increases.

76.    During the question-and-answer portion of the 1Q 2025 Earnings Call, Defendant Romano fielded the very first question, in which a Truist Securities analyst pinpointed the need for explanation concerning the $TiO_2$ sales volumes and "winning market share" "over the last few months" that Defendants had misleadingly touted in their prepared remarks. Defendant Romano stated in pertinent part:

> **Peter Osterland**
> Hey. Good morning. Thanks for taking the questions. So first, I was just wondering if we could get an update on how your expectations for $TiO_2$ volume growth are shaping up this year? I know there's a couple of pieces there with underlying end-market demand as well as any above-market growth from winning market share. How is your outlook for the growth you would get this year from each of those

evolved over the last few months?

**John D. Romano**
Yeah. Thanks for the question. So from the standpoint of growth, again, we made reference that as we go through the year, we're going to start to see a lift in the $TiO_2$ demand. <u>And it's largely driven from the duties that are in Europe already on the anti-dumping</u> and the assumptions that we've made with regards to India and Brazil in the second half of the year. So what we're expecting in India is that we should have a final results on duties at the third week of May. And in June, towards the end of June, we should have a decision on Brazil. **So the volume that we're seeing as far as growth is largely driven by the duties in the areas where the anti-dumping has taken effect. We also saw in the first quarter, as I mentioned in the prepared comments, North America and Europe was up significantly. Again, Europe was driven by largely the duties,** but North America's volume has picked up as it had seasonally. So, it was a good move in North America. **Still seeing some competitive activity in Latin America, Asia Pacific and the Middle East**. But as we get into the second half of the year, we are still anticipating to see that growth on the $TiO_2$ demand in the regions that I just referenced.

77.   The foregoing statements were materially false and misleading when made because: (i) Defendant Romano falsely touted incremental growth in European demand, European $TiO_2$ sales volumes, and European $TiO_2$ revenue due to the "anti-dumping" duties as a "key message[]" and in a misleadingly rosy light, without disclosing the highly material fact that Chemours was simultaneously successfully executing a strategy of outcompeting Tronox for sales volumes and market share, and the attendant revenues therefrom; and (ii) by touting European growth, and separately excluding Europe from areas of increased "competitive activity[,]" Defendant Romano generated a materially false impression that Tronox was not then experiencing price and market share competition, which it was because of Chemours' strategy in "fair trade" markets.

78.   Later, a UBS Securities analyst directly asked Defendants to "size the expectations that you have for maybe the [market] share opportunity that you can recapture" in regions, including Europe, that had enacted anti-dumping duties for $TiO_2$ pigment or were considering them. Defendant Romano stated unequivocally: "So, let's go back and take a look at what was

28

historically being exported into the European market from China, and it was, call it 270,000-ish tons a year. **And so, you've seen the lift and we're getting our share of the growth as China has pulled back on their exports into that region**."

79.    The foregoing statement was materially false and misleading when made because Defendant Romano falsely touted incremental growth in European market share and in a misleadingly rosy light, without disclosing the highly material fact that Chemours was simultaneously successfully executing a strategy of outcompeting Tronox for sales volumes and market share, and the attendant revenues therefrom.

80.    Later during the 1Q 2025 Earnings Call, Defendants were directly asked by an analyst from Alembic Global Advisors about the Company's TiO$_2$ pigment pricing. Defendant Romano falsely stated, in pertinent part:

**Hassan I. Ahmed**
…. But if I heard correctly, you guys also mentioned, you know, gaining pricing momentum. So I'm just trying to sort of reconcile that, that historically, obviously, as we move away from the seasonally strong time period, you know, which tends to be the, call it, spring/summer time period, it gets harder and harder for the industry to get that pricing. So I'm just trying to assess, you know, what gives you that comfort level that you will indeed get that pricing in the second half?

**John D. Romano**
Yeah. Thanks, Hassan. It's a great question. **We didn't talk too much in prepared comments about what's going on in the second quarter because we provide guidance for the full year, but we are getting price in Europe.** So when we think about our second quarter, historically, you go eight quarters with continual price erosion, 1% to 2% a quarter. It takes a little bit of time to get traction on a price increase. **And we did announce a price increase in Europe in the second quarter and we have successfully implemented a portion of that. So when we think about our second quarter price, there's still some competitive activity in other regions, so that's puts and takes on where we are on price. But I would say our price will be flat to slightly up this quarter, depending upon how we manage some of this competitive activity. But we are getting pricing in Europe**. And when we think about, is that a demand profile increase? No. That's due to a shift in the supply base. So we're making progress. And as we start to look into the back half of the year and some of these other areas where we've got opportunities for

29

duties to go into place, we're not talking about a significant amount of pricing, but we are talking about pricing opportunities.

81.     The foregoing statements were materially false and misleading when made because: (i) Defendants falsely touted "getting price" and having "successfully implemented" price increases in Europe, without disclosing the highly material fact that Chemours was simultaneously successfully executing a strategy of outcompeting Tronox for sales volumes and market share by selling at lower prices, thereby rendering the price increases that Defendant Romano was touting unsustainable; and (ii) by touting European "pricing" growth, and explicitly excluding Europe from "other regions" experiencing increased "competitive activity[,]" Defendants generated a materially false impression that Tronox was not then experiencing price and market share competition, which it was because of Chemours' strategy in "fair trade" markets.

82.     Defendants were again repeatedly pressed about their statements concerning market share gains in anti-dumping zones. Defendant Romano falsely stated, in pertinent part:

> **Hassan I. Ahmed**
> Very helpful. And as a follow-up on the anti-dumping side of things, I just wanted to get a bit more granular about what's going on over there. I mean, look, first of all, maybe it's a two part thing …. And then the second part of that question is just on the ground, what are you guys seeing? Meaning, are you sort of – as you're talking to your customers, particularly in countries where these anti-dumping measures are going into effect, are the conversations you're having with them sort of more along the lines of them actually wanting more material from you guys? <u>Are you getting more inbound requests now from customers that were, sort of taking their business elsewhere? I mean, are you actually seeing that market share gain or indications of that  as these conversations continue</u>?

> **John D. Romano**
> Yeah. **So for sure in Europe that's happening, we are picking – we're regaining share where we had lost it to the Chinese historically, because those duties are already in place.** And when you think about sizing the opportunity, so again, we're not assuming that China is going to completely vacate Europe. They're still supplying there. They're about half where they were. And we would expect that to continue to trickle down. But our assumptions aren't that they're going to completely abandon that market, that we're going to get a fair share of what's the opportunity. **So again, we saw a significant move in the first quarter. That's**

**migrating into the second quarter. So again, we're building on what's already happened in Europe.**

\*\*\*

**Aaron Rosenthal**
Okay. Great. I think earlier you had mentioned the uplift quarter-over-quarter in Europe was about 2x what you had seen historically from 4Q to 1Q. Is that comment based on a look back from maybe just the last couple of years? Or is that maybe a 10-year average look back with respect to seasonality? And then as we think about 2Q, is the magnitude of that uplift into 2Q on par with that? Or how should we think about that growth sequentially?

**John D. Romano**
So the growth from Q4 to Q1 was abnormal. So it's not even – you can't – there's been no quarter where we had Q4 to Q1 that was that large. **So it had everything – that was very much focused on us picking back up share as the duties went into place early in June – in July – I mean, January, sorry about that. And we're seeing more of a, I'd say, bit more of a normal increase, but still heavier in second quarter in Europe as well.**

**So again, it's not as if – I think we've started to see growth in the volume as we pick up some of that share**, but we still have room to go. **So the second quarter, although, the growth is significant, it's not as big of a leap as it was in – from Q4 to Q1, but we're still seeing growth quarter-over-quarter Q1 to Q2.**

83. The foregoing statement was materially false and misleading when made because Defendant Romano falsely touted incremental growth in European market share and in a misleadingly rosy light, without disclosing the highly material fact that Chemours was simultaneously successfully executing a strategy of outcompeting Tronox for sales volumes and market share, and the attendant revenues therefrom.

**B. Materially False and Misleading Statements in the 1Q 2025 Form 10-Q Filed With the SEC on May 1, 2025**

84. On May 1, 2025, Tronox filed its Form 10-Q quarterly report with the SEC, reporting the Company's financial and operational results for its first fiscal quarter of 2025 ended March 31, 2025 (the "1Q2025 Form 10-Q"). The 1Q2025 Form 10-Q was signed by Defendant Srivisal and Jonathan P. Flood, Vice President, Controller and Principal Accounting Officer, and

was accompanied by certifications signed by Defendants Roman and Srivisal pursuant to: (i) Section 302 of the Sarbanes-Oxley Act of 2002, stating that each had reviewed the 1Q2025 Form 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading[;]" and (ii) Section 906 of the Sarbanes-Oxley Act of 2002 and for the purpose of complying with Rule 13a-14(b) of the Exchange Act stating that each agrees "the information contained in the [1Q2025 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of" Tronox.

85.    The 1Q2025 Form 10-Q also instructed investors to review the risk warnings contained in the Company's 2024 Form 10-K, stating in relevant part that: "you should carefully consider the factors discussed under 'Risk Factors' included in our Annual Report on Form 10-K and any subsequent filings thereto with the SEC." Thus, the risk factors listed at Item 1A in the 2024 Form 10-K were incorporated by reference into, and thereby repeated to the marketplace through the issuance of, the 1Q2025 Form 10-Q.

86.    Despite price and market share competition in Europe since 1Q 2025, the "Risk Factors" in 2024 Form 10-K posed these risks as mere hypotheticals, stating, in pertinent part (original emphasis omitted):

> **Any of the following risks could materially and adversely affect our business, financial condition and results of operations**…..
>
> Our industry and the end-use markets in which we compete are highly competitive and are characterized by excessive production capacity, particularly in China. **Competition** and excess production capacity **may adversely affect our results of operations and operating cash flows.**
>
> Each of our markets is highly competitive. Competition in the TiO industry is based on a number of factors such as price, product quality, and service. We face significant competition from major international and smaller regional competitors, especially producers in China. Chinese producers have significantly expanded their

32

TiO production capacity in recent years and the volume of their exports and have publicly announced their intention to continue to expand their TiO production capacity and aggressive exports efforts. Moreover, the increased Chinese TiO production capacity, along with the prolonged economic downturn in China, is resulting in increasing quantities of TiO being exported to other regions of the world in which we compete typically at lower prices.

We compete with a large number of mining companies with respect to zircon. Zircon producers generally compete on the basis of price, quality, logistics, delivery, payment terms and consistency of supply. Moreover, increased Chinese production of zircon from heavy mineral concentrates imported from Africa and Australia, along with the prolonged economic downturn in China, is resulting in increasing quantities of zircon being exported by China to other regions of the world in which we compete.

**In addition, we face substantial risk that our customers could switch to our competitors' products in response to any number of developments including lower price offerings by our competitors for substantially the same products**, new product development by competitors, or with respect to zircon customers, switching to lower priced substitute products. **Our inability to** develop, produce or **market our products to compete effectively against our competitors could have a material adverse effect on our business, financial condition, results of operations and cash flow**.

87. Furthermore, the 1Q2025 Form 10-Q falsely and misleadingly stated "**[t]here have been no material changes from the risk factors disclosed under the heading 'Risk Factors' in our Form 10-K**."

88. The foregoing statements were materially false and misleading when made because Tronox's price increases in Europe and "lower price offerings" from competitors like Chemours had already effectuated the material risk that Tronox could not "compete effectively against [its] competitors" and thereby affecting its business and financial results, including material impacts to market share and sales.

C. **Defendants' Materially False and Misleading Statements Deceived Investors into Believing Tronox Was Successful in Gaining Market Share, Sales Volumes, and Price Increases in 2Q 2025**

89. Defendants' materially false and misleading statements, including misrepresentations that Tronox was successfully gaining market share and price increases Europe

33

without competition (which analysts believed was contained to Latin America, the Middle East, and Asia), successfully misled investors. For instance, on May 1, 2025, Truist Securities published a report, titled "Earnings Growth Likely a 2H Story; Signs of TiO2 Pricing Stabilization a Plus[,]" stating in relevant part (bolding in original):

> **Near-term improvement for TiO2 fundamentals mainly driven by anti-dumping duties**. TROX expects to see TiO2 volumes pick up during the year driven by anti-dumping duties in the EU, as well as new duties anticipated to be imposed in Brazil and India during 2Q. TROX did note seasonally improving demand in North America but is seeing elevated competitive activity across several other regions including Latam, Middle East, and Asia. On TiO2 pricing, TROX noted some partial success implementing price increases in Europe in 2Q and believes average realized pricing could be flat to slightly up q/q in 2Q.

90.    Similarly, on May 5, 2025, Deutsche Bank issued a report titled "Plethora of Drivers for 2H Earnings Ramp[,]" stating in relevant part:

> In the quarter, a stronger-than-normal seasonal demand uplift in TiO2 volumes, led by Europe which is seeing the effects of the anti-dumping duties, was more than offset by increased competitive activity in Latin America, Middle East and Asia and higher-than-expected production costs due to lower operating rates at Botlek and increases in direct material prices. In Q2, while Tronox is getting some TiO2 pricing in Europe, it is still seeing competitive activity in other regions as Chinese suppliers attempt to find a home for their former Europe-bound TiO2. And coupled with a soft demand outlook and higher production and mining costs, Tronox provided a muted outlook for Q2 with EBITDA flattish versus Q1. Notwithstanding a weak 1H that will likely see EBITDA down an estimated 22% YoY and 56% versus '23, Tronox reaffirmed its full-year guidance. At the midpoint of the guide, 2H EBITDA would be a robust $350MM versus ~$225MM in 1H. While we do not normally ascribe to a 55% earnings ramps from 1H to 2H in the midst of a recession, we believe this ramp is achievable due to a plethora of earnings drivers Tronox has for 2H. These include: i) Lower mining costs as the bulk of the $50-$60MM of higher mining costs in '25 were in 1H; ii) stronger volumes building on the momentum from the anti-dumping measures in Europe and the additional benefits expected to be seen in India and Brazil when their duties are finalized; iii) higher pricing; iv) lower production costs driven by lower pigment costs as plants run better and the shutdown of Botlek, Tronox's highest cost plan, and v) growing savings from the ~$150MM cost improvement program launched in Q4'24.
>
> ***
>
> In the quarter, a stronger-than-normal seasonal demand uplift in TiO2 volumes, led by Europe which is seeing the effects of the anti-dumping duties, was more than

34

offset by increased competitive activity in Latin America, Middle East and Asia and higher-than-expected production costs due to lower operating rates at Botlek and increases in direct material prices. In the quarter, TiO2 volumes fell 1% YoY but increased 12% QoQ which was slightly below guidance of similar to the prior year period. By region, Europe led the sequential growth bolstered by anti-dumping duties with volumes double what it normally sees in Q1 as Tronox is picking up share as duties went into effect. North America also enjoyed a stronger-than-normal seasonal demand uplift. Meanwhile, increased competitive activity in Latin America, Middle East and Asia kept volumes in those regions muted.

**DEFENDANTS REVEALED THE TRUTH IN A SET OF DISCLOSURES MADE ON JULY 30, 2025 AND JULY 31, 2025**

91.    In disclosures on July 30, 2025 and July 31, 2025, Defendants corrected the misimpression from their previous misstatements—including Defendant Romano's assertions that Tronox was competing for market share in the valuable European market after the European Commission's final anti-dumping duties went into effect in early January 2025.

92.    On July 30, 2025, Defendants announced Tronox's 2Q 2025 financial results in a press release (the "2Q 2025 Press Release"), issued after market close, via PR Newswire. The 2Q 2025 Press Release was concurrently filed with the SEC.

93.    In the 2Q 2025 Press Release, Defendants revealed that 2Q 2025 revenue of $731 million, which was a 1% decrease from 1Q 2025 (despite Tronox's second quarters historically being seasonally stronger than first quarters), and an 11% decrease compared to 2Q 2024. With respect to $TiO_2$ specifically, Defendants disclosed that revenue was $587 million, a 10% decline year-over-year driven by an 11% decline in sales volumes despite average selling prices remaining "flat."

94.    Remarking on these results, Defendant Romano stated in the 2Q 2025 Press Release, in pertinent part, "Tronox's second quarter results were impacted by weaker demand across most of our end markets. This resulted in a softer than anticipated coatings season ***and heightened competitive dynamics***."

35

95.    Defendants also revealed in the 2Q 2025 Press Release that estimates for Tronox's revenue, Adjusted Earnings Before Interest Taxes Depreciation and Amortization ("Adjusted EBITDA"), and free cash flow were being *revised downward* to ranges of $3.0-$3.1 billion (revenue), $410-460 million (Adjusted EBITDA), and negative free cash flow of $100-170 million, respectively. Tronox's previous estimates for revenue, Adjusted EBITDA, and free cash flow were $3.0-$3.4 billion, $525-625 million, and "greater than $50 million" (*i.e.*, positive free cash flow), respectively.

96.    Defendants explained in the 2Q 2025 Press Release that the Company's reduced revenue and Adjusted EBITDA guidance "assume lower [TiO$_2$] pigment…volumes and price than previously anticipated" and that Tronox's negative free cash flow guidance was the result, in part, of lower expected pigment sales.

97.    Furthermore, in the 2Q 2025 Press Release, Defendants announced a 60% dividend cut and reductions in the Company's capital expenditures down to "less than $330 million" compared to "less than $365 million" forecasted the previous quarter.

98.    On July 31, 2025, Defendants Romano and Srivisal jointly participated in the 2Q 2025 Earnings Call, and a transcript of the 2Q 2025 Earnings Call was contemporaneously uploaded to the Company's Investor Relations webpage.

99.    During, the 2Q 2025 Earnings Call Defendant Romano disclosed in prepared remarks that "key messages from the quarter" included that "weaker" TiO$_2$ demand was caused, in part by "heightened competitive dynamics across our *key end markets*." Defendant Srivisal echoed this, stating that "[a]s John covered earlier, in the second quarter, we saw a challenged demand environment, including heightened competition, putting pressure on TiO$_2$ and Zircon sales."

100.    During the 2Q Earnings Call's question-and-answer session, Defendant Romano's

36

first question was an open-ended query from a Deutsche Bank analyst about what "various drivers and variables" would affect where the Company landed at the end of 2025 within its now reduced Adjusted EBITDA guidance range. Defendant Romano answered by pivoting to second quarter results and providing further detail regarding what "key" market he was referring to that experienced increased $TiO_2$ pricing competition—emphasizing the paramount importance of this issue. Defendant Romano specifically answered that "[a]s I mentioned on the call, there is some competitive activity out there in Europe[,]" despite never mentioning Europe previously, and that Tronox lost market share meaning previous price increases in EMEA would need to "reverse" to get in line with competitors. Specifically, Defendant Romano stated, in pertinent part:

> **David Begleiter**
> Good morning. John, just looking for your guidance, what are the various drivers and variables that will determine whether you come at the higher end or lower end of the $410 million to $460 million range?
>
> **John D. Romano**
> Thanks for the question, David. So largely, as you know, ***not dissimilar to what happened, I guess, in the second quarter, a lot of it's going to be based on volume and price***. And when we think about that guide, we're not projecting to have any significant bump in volume. There's a little bit of a move in the second half of the year, and that's largely based on some targeted gains that we believe we're going to get in India. That's a market that we continued to see positive growth in.
>
> ***As I mentioned on the call, there is some competitive activity out there in Europe***. We saw a bit of a -- it wasn't as if we saw a significant drop, but there was some competitive activity there. So where we had price increases in the second quarter, some of ***that's going to reverse***. So some of the pricing that we had forecasted in the second half of the year is not going to come in and ***we're actually seeing some erosion in price***. ***So I'd say largely when we think about the EBITDA guide, it's the price and volume.*** And there is some active piece of that that's attached to slowing our production down as well.

101.    In a follow up question from a Truist Securities analyst, Defendant Romano admitted that $TiO_2$ "competitive activity" in Europe specifically meant competitors underpriced Tronox in that region to attain market share:

37

**Peter Osterland**

Thank you. Good morning, everyone. Just wanted to start with the 2% sequential decline for TiO$_2$ volumes that you saw in the quarter. Could you break out what you believe the growth rate was for underlying demand quarter-over-quarter? And how much of the decline you realized was driven by market share?

**John D. Romano**

[] In Europe, Middle East and Africa, there were some volume decline. Part of that was the market actually wasn't as robust as it was in the first quarter. So it kind of slowed down. And I think there is some element of the macroeconomic environment along with some of the tariff issues that probably weighed on some people's decision to pull down inventory. There was an element of competitive activity there. *As I mentioned, we raised prices in the second quarter and there were some competitors that pulled back for volume in that region*. So Europe, Middle East and Africa was down a bit.

102.    Similarly, in response to a question from JPMorgan Securities analyst Jeffrey J. Zekauskas requesting "a sense of the geographic pricing dynamic[,]" Defendant Romano stated, in pertinent part:

…So the competitive environment right now, I would say, as far as pricing goes are in areas like Europe, Middle East and Africa. I mentioned that there was a volume decline in that region where we had price increases in the second quarter and *we had some competitive activity where some competitors actually reduced price to move volume*. So you've got Europe, Middle East and Africa. Middle East is a competitive environment right now. It's not a duty-affected area.

103.    Analysts requested even more clarity, asking explicitly how Tronox's second quarter TiO$_2$ sales volumes compared to Chemours. Defendant Romano admitted that he knew "what's happening in the market with competition" and that "there's a lot of fluctuations in market share." Defendant Romano stated that going forward, Tronox's "objective" was to "maintain our share at normalized rates" (*i.e.*, to align the Company's pricing with Chemours), and with respect to Europe, Defendant Romano stated, in pertinent part:

[] In Europe, our volumes – for Europe, Middle East and Africa, they were down and part of that had to do with the market actually just not being as robust as we thought it was. We weren't planning for it to be stronger, but it was actually weaker than we expected it to be. *And there was competitive activity over there where, as I mentioned, we were raising prices and we had some competitors that were losing*

38

*prices*. ***And we picked, and we lost a little volume there***… And our objective is to maintain our share at normalized rates throughout the year. So I can't speak too much to Chemours on what they announced back in June. And but, ***generically, I know what's happening in the market with competition***. And in the regions that I mentioned, there's – the competition is up, it's elevated.

104. On this news, Tronox's common stock price declined approximately 38%, declining from a closing price of $5.14 per share on July 30, 2025 to a closing price of $3.19 per share on July 31, 2025, on unusually heavy trading volume.

## ADDITIONAL SCIENTER ALLEGATIONS

105. As alleged herein, Tronox and the Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly, or recklessly, and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

106. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Tronox, their control over, and/or receipt and/or modification of Tronox's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Tronox, participated in the fraudulent scheme alleged herein.

107. Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

108.    The Individual Defendants were each executive officers and/or directors of Tronox during the Class Period. Based on their roles at Tronox, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein, which centers on European $TiO_2$, the Company's largest region and product for driving revenue and Adjusted EBITDA, by far, during the Class Period. European $TiO_2$ revenue, pricing, and Adjusted EBITDA were critical financial metrics for Tronox during the Class Period, and thus, were core operations during the Class Period, such that Defendants would have had knowledge of material information related to these topics during the Class Period.

109.    At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems that Tronox had competing for market share in the European $TiO_2$, Defendants knew, or recklessly disregarded, the extent and scope of their statements during the Class Period.

110.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

111.    In addition, the Individual Defendants' numerous admissions that they monitored and analyzed $TiO_2$ sales and pricing performance in relation to competitors (who they admit included Chemours) and by geography, including Europe, on an at least monthly basis, establish that Defendants were constantly and carefully monitoring Tronox's European $TiO_2$ revenue, pricing, market share, and Adjusted EBITDA at all relevant times during 1Q25 and 2Q25.

112.    The allegations above also establish a strong inference that Tronox, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Tronox's true operating condition and present and expected financial performance from investors. By concealing these material facts from investors, Tronox maintained and/or increased its artificially inflated common stock price throughout the Class Period.

113.    As executives and/or directors of Tronox, the Individual Defendants are both candidates for imputing corporate scienter to Tronox.

## LOSS CAUSATION

114.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Tronox common stock and/or maintaining the artificial inflation in Tronox's common, by publicly issuing and endorsing materially false and/or misleading statements and omitting to disclose material facts necessary to make those statements, as set forth herein, not materially false or misleading. Said statements and omissions were materially false and/or

41

misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about the Company's business, operations, and prospects as alleged herein.

115.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and the other members of the Class. As described herein, during the Class Period, Defendants named in this action made or caused to be made a series of materially false or misleading statements concerning the Company's business prospects. Defendants' statements were materially and objectively misleading when made, as set forth *supra*, and had the cause and effect of creating in the market an unrealistically positive assessment of Tronox's competition for market share in Europe, thus causing Tronox's common stock to be overvalued and artificially inflated at all relevant times. The materially false or misleading statements made or endorsed by Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing Tronox common stock at artificially inflated prices, thus causing the damages complained of herein.

116.    Defendants issued a set of corrective disclosures contained within the 2Q 2025 Press Release and the 2Q 2025 Earnings Call. This set of corrective disclosures revealed, *inter alia*, that, contrary to Defendants' representations, Tronox was failing to compete for market share in Europe throughout 2Q 2025 because Tronox had priced itself out of that market.

117.    On July 31, 2025, in response to Defendants' corrective disclosures, the price of Tronox common stock fell sharply, dropping $1.95 per share or approximately 38% on unusually heavy trading volume, declining from a closing price of $5.14 per share on July 30, 2025 to a closing price of $3.19 per share on July 31, 2025, thereby removing the artificial inflation caused and/or maintained by Defendants' false and misleading statements and causing economic loss to investors

who had purchased Tronox common stock during the Class Period.

118. Analysts were surprised by Defendants' disclosures. On July 30, 2025, Truist Securities analysts published an investment research report entitled "2Q25 Initial Take: Anticipated Guidance Cut Worse Than Feared" which noted: "TROX posted a 2Q EBITDA miss of 15% and guided full-year EBITDA approximately 11% below pre-report consensus at the midpoint. *TiO2 volumes fell sharply YOY and notably declined seq'l, which we believe likely indicates the company ceded market share in order to maintain price during the quarter.* TROX now expects a significant FCF burn for the full year and has further reduced capital expenditures and announced a 60% dividend cut in order to preserve cash." On August 1, 2025, after Defendants held the 2Q 2025 Earnings Call, Truist issued another report confirming its "Initial Take[.]" In this subsequent report, titled "2Q25 Earnings Recap: Market Share a Focus as Competitive Intensity Rises; Lowering PT to $5 from $9" Truist's analysts stated, in pertinent part (bolded emphasis in original):

> **Weak domestic coatings demand and heightened global competitive dynamics weigh on TiO2 volumes.** TiO2 volumes were down 11% YOY and 2% seq'l. In N. America, TROX indicated that it did not lose market share but saw weak underlying demand limit the seasonal seq'l pickup to 2-3%. <u>Volumes were down more meaningfully in EMEA driven by weak demand conditions combined with increased competitive activity; while TROX implemented higher prices in the region, certain competitors reduced prices, driving some share loss for TROX.</u> Going forward, TROX indicated that it expects 2H TiO2 volumes to be improved over 1H driven by strength in the Indian market and an overall heightened focus on maintaining and growing market share, although we do expect this will come at the expense of seq'l lower average realized prices vs 1H.

119. Analysts from JPMorgan Chase & Co. echoed the same concerns as the Truist reports. On August 1, 2025, JPMorgan issued a report simply titled "Poof" and observed, in pertinent part:

> Tronox shares dropped roughly ($2) in a day from $5 to $3 /sh or by about (40%) in a flat to down market. Tronox's TiO2 volumes were about (10%) lower y/y in the second quarter, and *it seems that TiO2 pricing decreases, not increases, are coming down the pipe despite China cutting its production and shipments. The Western*

43

*TiO2 companies are financially distressed and battling it out in Europe and India for market share*.

120.   These analyst reports demonstrate that investors viewed the Company's disclosures as revealing that Tronox had *not* "successfully implemented" pricing increases, or successfully competed for European market share in 2Q 2025 as Defendants previously stated. Instead, Tronox had lost European market share in 2Q 2025 from pricing its products above competitors' and that Tronox would need to reduce pricing to compete for market share throughout the remainder of 2025.

## CLASS ALLEGATIONS

121.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Tronox publicly traded common stock between May 1, 2025 and July 30, 2025, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are the Company and its subsidiaries, affiliates, officers, and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

122.   Because Tronox common stock was actively traded on the NYSE, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by Tronox or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

123.   Plaintiffs' claims are typical of those of the members of the Class, as all Class

44

members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent who are experienced in class action and securities litigation.

124. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a. Whether Defendants violated the federal securities laws as alleged herein;

b. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the Company's business and operations;

c. Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e. Whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f. Whether the prices of Tronox's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g. Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

125. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done

to them. There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE

126. Plaintiffs are presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for Tronox's common stock was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of Tronox's common stock. Throughout the Class Period:

    a. Tronox's common stock was actively traded on the NYSE;

    b. The market price of Tronox's common stock reacted promptly to the dissemination of public information regarding the Company;

    c. Tronox was followed by financial analysts, including those cited in this Complaint;

    d. Tronox common stock maintained a high average weekly trading volume during the Class Period;

    e. As a regulated issuer, the Company filed with the SEC periodic public reports during the Class Period;

    f. The Company regularly communicated with public investors via established market communication mechanisms; and

    g. During the Class Period, Tronox's common stock had approximately 158,000,000 shares outstanding and a market capitalization of approximately $815 million at market close on July 30, 2025.

127. Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relies upon the Company's financial results and

management to accurately present the Company's financial results. During this period, the Company and the Individual Defendants pumped materially false and misleading information into the marketplace regarding the Company and material facts relevant to Tronox's European pricing and market share. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of Tronox's common stock.

128.    As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for Tronox's common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

129.    Plaintiffs and other Class members justifiably relied on the integrity of the market price for Tronox's common stock and were substantially damaged as a direct and proximate result of their purchases of Tronox's common stock at artificially inflated prices and the subsequent decline in the price of such common stock when the truth was disclosed.

130.    Plaintiffs and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

131.    Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased Tronox's common stock at artificially inflated prices.

47

**NO STATUTORY SAFE HARBOR**

132.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

133.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

134.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

**COUNT I**
**Violation of Section 10(b) of the**
**Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

135.    Plaintiffs reallege each allegation as if fully set forth herein.

136.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

137.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain

48

the market price of Tronox's common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Tronox's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

138. During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, all in an effort to maintain artificially high market prices for Tronox's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

139. During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control it, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

140. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

141. As a result of the foregoing, the market price of Tronox's common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and knowing and/or reckless inability to effectuate their purported business plans, Plaintiffs and the other members of the Class relied on the statements and business plans described above and/or the integrity of the market price of Tronox's common stock during the Class Period in purchasing Tronox's common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

142. Had Plaintiffs and the other members of the Class been aware that the market price of Tronox's common stock had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased Tronox's common stock at the artificially inflated prices that they did, or at all.

143. As a result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiffs' and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiffs and other members of the Class purchased Tronox's common

50

stock in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of Tronox's common stock through their misconduct as described herein. Plaintiffs' and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, Defendants' concealment of material facts related to Tronox's business and prospects.

144. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Tronox's common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

145. Plaintiffs reallege each allegation as if fully set forth herein.

146. This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

147. Tronox and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

148. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

149. Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of the Company, directly or indirectly, controlled the conduct of the Company's business and their representations to Plaintiffs and the Class, within the meaning of

51

Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiffs' and the Class's investments in Tronox's common stock within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

150.    The Individual Defendants controlled and had the authority to control the content of Company's SEC statements, press releases and other public statements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

151.    The Individual Defendants knew or recklessly disregarded the fact that the Company's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

152.    By virtue of their high-level positions and their participation in and awareness of the Company's operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

153.    As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

154.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of Tronox's common stock.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.    Granting Plaintiffs leave to amend this complaint to conform to the evidence; and

E.    Awarding such equitable/injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Respectfully submitted,

Dated: April 7, 2026          LEVI & KORSINSKY, LLP

/s/ *Gregory M. Potrepka*
Gregory M. Potrepka (ct30056)
1111 Summer Street, Suite 403
Stamford, CT  06905
Tel: (203) 992-4523
Email: gpotrepka@zlk.com

*Lead Counsel for Plaintiffs and the Class*

THE ROSEN LAW FIRM, P.A.
Jacob A. Goldberg (admitted *pro hac vice*)
101 Greenwood Avenue
Jenkintown, PA 19046
Tel: 215-600-2817
Email: jgoldberg@rosenlegal.com

*Additional Counsel for Plaintiffs and the Class*

54